AUDIO ODYSSEY, LTD., an Iowa
Corporation; Dogan A. Dincer;
and Ann M. Dincer, Plaintiffs,

v.

BRENTON FIRST NATIONAL BANK,
an Iowa Banking Corporation; Mi-
chael M. Bladel, Sheriff of Scott
County, Iowa; John M. Norris, Deputy
Sheriff of Scott County, Iowa;
Charles A. Barton; John C. Bradley;
Chris A. Pieper; Roger Hoffman;
Merchants Bonding Company, a Cor-
poration, Defendants.

Audio Odyssey, Ltd., an Iowa Corpora-
tion; Dogan A. Dincer; and Ann
M. Dincer, Plaintiffs,

v.

Bernard J. Hofmann; and Anderson &
Nelson, a Professional Corporation,
Defendants.

No. 3:97–CV–40082.

United States District Court,
S.D. Iowa,
Davenport Division.

Sept. 22, 2003.

Stuart R. Lefstein, Dale G. Haake, Katz, McHard, Balch, Lefstein & Fieweger, PC, Rock Island, IL, for Plaintiffs.

Steven L. Nelson Davis, Brown, Koehn, Shors & Roberts, PC, Des Moines, IA, Terry J. Abernathy, Stephanie L. Hinz, Pickens, Barnes & Abernathy, Cedar Rapids, IA, Thomas C. Fritzsche, Michael J. Walton, Scott County Attorneys Office, Davenport, IA, Robert D. Houghton, Richard S. Fry, Diane Kutzko, Shuttleworth & Ingersoll, Cedar Rapids, IA, Realff J. Ottesen, Michael J. Walton, Ottesen & Walton, Davenport, IA, Gary L. Hayward, Asst U.S. Atty, United States Attorney, Des Moines, IA, for Defendant.

## ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT

GRITZNER, District Judge.

This matter comes before the Court on Cross Motions for Summary Judgment. A hearing on the motions was held August 29, 2003. Representing Audio Odyssey were Dale Haake and Stephen Fieweger of Katz, Huntoon & Fieweger. Representing Defendants Bernard J. Hofmann and Anderson & Nelson ("Law Firm") was Diane Kutzko of Shuttleworth & Ingersoll. Representing Brenton Bank, John Bradley, Chris Pieper, and Merchants Bonding ("Bank") was Stephanie Hinz of Pickens, Barnes & Abernathy. Representing Scott County Sheriffs Michael Bladel, John Norris, and Charles Barton ("Scott County") was Michael Walton of the Scott County Attorney's Office.

### FACTS [1]

In 1977, Dogan Dincer began working at Audio Odyssey, Ltd. ("Audio Odyssey"), an electronics store located in Davenport, Iowa. He eventually became manager and part-owner of the business. In October 1991, Dincer bought out the majority shareholder's interest in the company and thereby became Audio Odyssey's sole shareholder. To finance the purchase, a $200,000 loan was negotiated with Brenton

---

[1] Although the facts of this case can be found in several published opinions, issues never previously addressed by the Court make a recitation of the facts necessary.

Bank, 85 percent of which was guaranteed by the Small Business Administration ("SBA").

A Security Agreement ("SA") signed by Dogan and Ann Dincer gave Brenton a security interest in Audio Odyssey's accounts, general intangibles, contracts, instruments, chattel paper, documents, inventory, furniture, machinery, equipment (including motor vehicles, trucks, and trailers), and fixtures located on the property. Audio Odyssey's loan obligations included making a monthly principal and interest payment, maintaining insurance on the collateral, and keeping current on tax obligations. In the event of default, the SA allowed Brenton, to accelerate the loan, enter the premises and take the collateral. The loan documents included a lease assignment ("Lease Assignment") which provided that in the event of default, the Bank could, without notice, enter the leased premises and, inter alia, remove all Audio Odyssey's property, sell all Audio Odyssey's property, and/or transfer and assign the lease.

In late 1994, Audio Odyssey began experiencing financial difficulties and fell behind on its loan obligations, including the loan mortgage, taxes, and insurance payments. Brenton agreed to accept interest only payments on the loan mortgage from November 1994 through February 1995. Despite this arrangement, by March 1995, Audio Odyssey's financial situation had not improved. In addition to being behind on its mortgage and taxes, Audio Odyssey was overdrawn on its business checking account. Brenton paid checks written on insufficient funds but informed Audio Odyssey not to perceive this as a willingness to cover overdrafts on an ongoing basis. In a letter dated March 27, 1995, John Bradley, Brenton's Vice President of Commercial Banking Services, warned Audio Odyssey that if it failed to cover the overdrafts and bring the mortgage into current status, Brenton may accelerate the entire principal balance on the loan. Around this time, in an attempt to remedy its financial problems, Audio Odyssey requested a line of credit from Brenton to purchase more merchandise; ultimately, the request was denied.[2]

By mid-July 1995, Audio Odyssey was behind on its mortgage and tax obligations, and its business checking account was overdrawn. On July 13, 1995, John Bradley contacted Roger Hoffman (R. Hoffman) of the SBA and informed him of the condition of Audio Odyssey's account. Bradley told Hoffman he feared the collat-

2. Audio Odyssey sought an SBA guaranteed line of credit from Brenton; however, Brenton advised Audio Odyssey that it would not recommend SBA approval of more credit without assurances that Audio Odyssey's business management was making improvements. Bradley suggested Audio Odyssey contact the Crowe Thomas Group, a business consulting firm. Upon the advice of Crowe Thomas advisor Sunder Subbaroyan, Audio Odyssey increased store hours, closed its service department, and reduced Dincer's salary. Based on these and other plans to improve Audio Odyssey's cash flow, as well as Audio Odyssey's representations that the line of credit was to purchase additional merchandise, Bradley initially recommended the SBA approve the line of credit.

However, while negotiating the line of credit, Subbaroyan became aware that Audio Odyssey intended to use the line of credit to pay Audio Odyssey's outstanding tax liability rather than to purchase new merchandise. On July 11, 1995, Brenton informed Subbaroyan that Audio Odyssey's business checking account was overdrawn $8,000 and that Audio Odyssey had issued another check for $16,000.

That same day, Subbaroyan sent a letter to Audio Odyssey stating that the discovery of this information was disconcerting and advised Audio Odyssey it had 72 hours to infuse sufficient capital into the business to cover its payroll tax liability and establish a plan to pay the sales tax liability or its relationship with Crowe Thomas would be terminated.

eral was at risk. R. Hoffman verbally agreed that if a satisfactory workout could not be arranged, Brenton could seek a replevin action. That same day, Dincer made a $6,983 deposit at Brenton, telling Vice President Chris Pieper he wanted the deposit applied to Audio Odyssey's overdue mortgage and van payments. However, Brenton applied the funds to the overdrawn checking account instead.[3]

At 8:50 a.m., July 14, 1995, Bradley hand delivered a letter to Dincer informing him that Brenton was accelerating the loan and demanded the remaining balance of $126,000 by 9:00 a.m. Dincer told Bradley he could not come up with that amount in ten minutes and referred Bradley to his attorney, Steven Wing. At 12:00 p.m., Wing faxed Brenton a letter arguing Audio Odyssey was not in default. That afternoon, Brenton's attorney, Bernard Hofmann ("Hofmann") of Anderson & Nelson, filed an ex parte replevin action in Scott County District Court. The petition alleged (1) Audio Odyssey was delinquent on its loan payments, failed to maintain insurance on the collateral, and failed to pay tax assessments which may be levied against the collateral; (2) in the event of default, the SA gave Brenton the right of possession of the collateral; and (3) without immediate action, the collateral was at risk of being destroyed, concealed, removed from the state, sold, transferred, or assigned. Hofmann filed the petition and posted a $300,000 bond.

Scott County District Judge James Havercamp reviewed the petition and discussed it with Hofmann. Hofmann explained that Audio Odyssey planned an "annual sale" that weekend and that the Bank feared the collateral would be sold or removed. Judge Havercamp also asked if notice was required. Hofmann explained Iowa's replevin statute gave the court discretion with regard to notice.

After reviewing the petition, Judge Havercamp signed the replevin order Hofmann had prepared. Pursuant to that order, a writ of replevin was issued by the Clerk of the Scott County District Court directing the Scott County Sheriff to deliver into Brenton's possession

> All inventory, fixtures, accounts, furniture, equipment and machinery on property described as follows:
>> 4050 square feet located at 1718 E. Kimberly Road, Davenport, Iowa, legally described as: part of the northwest quarter of the southwest quarter of section 18, township 78, range 4, east of the 5th p.m. . . . to the city of Davenport, Scott County, Iowa.

By this time it was late Friday afternoon. Hofmann took the writ to the Scott County Sheriff and told Sergeant Charles Barton he wanted the writ executed immediately. Barton explained that the deputies' shifts would be over soon, and there was no way to execute the writ that afternoon. Barton then asked if moving trucks and personnel were ready to remove the collateral. Hofmann told Barton those preparations had not been made. After calling and discussing the situation with Bradley, Hofmann asked Barton if the premises could be locked over the weekend and the property removed on Monday when trucks would be available. Barton reviewed the writ and said he could. Barton instructed Hofmann to fill out the "Directions to Sheriff" form. On that form, Hofmann directed the sheriff "if possible serve Dogan Dincer, President of Corporation—contact John Bradley at Brenton Bank, 323–3368—he will meet with you at store with a locksmith."

The paperwork was given to Deputy John Norris. Hofmann told Norris a locksmith would meet him at the store. Nor-

---

**3.** Eventually this amount was applied to the mortgage.

ris compared the directions with the court order and found no discrepancies, so he left for the store. About 4 p.m., Norris served the writ upon Dincer at Audio Odyssey. Dincer and the employees in the store were asked to leave, the inventory and other collateral was secured, the locks were changed, and "No Trespassing" signs were posted on the front and back doors. Norris testified that he kept the keys to the premises. That night, Dincer called Judge Havercamp at his home and told the judge he disputed the replevin action. Judge Havercamp advised Dincer to hire an attorney.

Monday morning, under Norris' supervision, the moving company began removing and inventorying the items described in the writ. By the middle of the week, the inventory was complete. The premises were locked, and Norris handed the keys over to Brenton representatives.

On August 2, 1995, after discussions between Audio Odyssey's newly appointed counsel and Brenton proved unproductive, Audio Odyssey sent a certified letter to the Scott County Sheriff demanding surrender of the premises. Without a response by August 4, 1995, Audio Odyssey moved to dismiss the replevin action and to return the real estate. A hearing scheduled for August 22, 1995, was continued and never completed.[4] On August 31, 1995, a court order was entered and a writ was issued ordering removal of the No Trespassing

signs and allowing Audio Odyssey to enter the premises.

On May 16, 1997, Audio Odyssey and the Dincers commenced several lawsuits stemming from the replevin action on July 14, 1995. A lawsuit against Brenton, certain Brenton employees, the bonding company, Scott County Sheriff Michael Bladel, Sergeant Barton, and Deputy Norris was consolidated with a lawsuit against Brenton's attorney, Hofmann, and the law firm, Anderson & Nelson. The complaints allege the Scott County Sheriff, Sergeant Barton, and Deputy Norris, along with private individuals, committed an unreasonable seizure of Audio Odyssey's real property when they changed the locks and posted the No Trespassing signs on the premises. Plaintiffs further allege Iowa's replevin statute was unconstitutional and therefore Defendants' seizure of Plaintiffs' personal property violated due process. The complaint also includes ten pendent state law claims.[5]

## PROCEDURAL HISTORY

On December 15, 1997, the district court dismissed federal claims against R. Hoffman of the SBA for failure to state a claim and on June 2, 1998, dismissed the Dincers for lack of standing. In two subsequent orders, the district court granted summary judgment in favor of all Defendants on all § 1983 claims finding (1) no constitutional violation; (2) Iowa's replevin statute comports with due process; (3) the conspiracy

---

**4.** The state court action was ultimately dismissed without prejudice in September 1999.

**5.** The amended complaint consists of twenty-one counts: Counts I–III and V–IX allege violations of 42 U.S.C. § 1983 against Brenton, Scott County Sheriff Bladel in his individual and in his supervisory capacity, Deputies Barton and Norris, Chris Pieper, Bernard Hofmann, and Roger Hoffman; Count IV alleges the Iowa replevin statute is unconstitutional; Count X alleges Bren-

ton and all listed individuals conspired to violate Plaintiffs' constitutional rights; and Counts XI–XXI are state law claims, including trespass, conversion, tortious interference with existing business relations, tortious interference with prospective business relationships, U.C.C. Commercial Reasonableness, U.C.C. Obligation of Good Faith, Action on Replevin Bond, Punitive Damages—Actual Malice, Punitive Damages—Legal Malice, Impairment of Collateral, and Abuse of Process, respectively.

claims necessarily failed because the underlying constitutional claims failed; and (4) the district court dismissed the pendent state claims. On appeal, a divided panel affirmed in part, denied in part, and remanded for further proceedings. Judge Loken dissented, stating he would have affirmed the district court's decision. *Audio Odyssey, Ltd. v. Brenton First Nat'l Bank, et al.,* 245 F.3d 721, 741 (8th Cir. 2001) [hereinafter *Audio Odyssey* (panel opinion)].

The Eighth Circuit vacated the panel opinion, granted a rehearing en banc, and heard additional arguments. *Audio Odyssey, Ltd. v. Brenton First Nat'l Bank, et al.,* 245 F.3d 721 (8th Cir.2001) *vacated, reh'g en banc granted and opinion reinstated,* 286 F.3d 498 (8th Cir.2002). The nine judge en banc court rendered a 4-1-4 decision and reinstated the panel opinion "in its entirety". *Audio Odyssey, Ltd. v. Brenton First Nat'l Bank, et al.,* 286 F.3d 498, 500 (8th Cir.2002) [hereinafter *Audio Odyssey* (en banc opinion)]. However, Judge Hansen wrote the following special concurrence:

> I concur in the court's reinstatement of the prior panel opinion, which affirmed in part, reversed in part, and remanded the case to the district court, *except* I do not concur in those portions of Part IV A and Part IV B of the prior panel opinion which hold that the initial execution of the writ of replevin by the deputy sheriff on Friday afternoon by closing the store and changing its locks constituted an unreasonable seizure of Audio–Odyssey's leasehold interest in violation of the Fourth Amendment. In my view, the initial seizure was constitutionally reasonable, and the sheriff's department's seizure of the premises only became unreasonable under the Fourth Amendment when the inventorying deputy turned the newly minted keys to the store over to the Bank on the following Wednesday afternoon after he had in-ventoried the personal property for the purposes of the writ. To the extent the court's opinion can be read otherwise, I do not concur in it. In order to make my position more clear, I join the dissent's factual recitation, chronology, and the analysis Judge Loken makes in Part A of that dissent; however, I do not join the balance of the dissent.

*Id.* at 501–02 (Hansen, J., specially concurring). Therefore, Part IV A and B of the panel opinion was overruled and Part A of Judge Loken's en banc dissent is the opinion of the court. *See id.* ("Chief Judge Hansen's special concurrence joins Part A of this dissent, which is therefore the opinion of the court overruling Part IV A of the panel opinion.").

To summarize, the Eighth Circuit affirmed the district court on the following points: (1) the Dincers lack standing; (2) Iowa's replevin statute is constitutional on its face and as applied in this case; (3) the initial seizure was constitutional until Wednesday July 19, 1995, when the collateral inventory was complete and the keys were given to the Bank; (4) the § 1983 claim against Roger Hoffman of the SBA fails; (5) the § 1983 claims against Sheriff Bladel in his individual and supervisory capacity fail; and (6) the § 1983 supervisory claim against Sergeant Barton fails.

The Eighth Circuit reversed and remanded portions of the district court's order finding genuine issues of material fact existed over (1) which party was responsible for the extended seizure; (2) the foreseeability of damages due to Audio Odyssey's extended lockout; (3) whether Audio Odyssey could have mitigated its damages by acting sooner; (4) whether state officials conspired with the Bank and the Law Firm to extend the seizure; and if so (5) whether the state officials or private individuals were entitled to qualified immunity.

## STANDARD FOR SUMMARY JUDGMENT

Federal Rule of Civil Procedure 56(c) states "the judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56(c)).

"To preclude the entry of summary judgment, the nonmovant must make a sufficient showing on every essential element of its case on which it has the burden of proof at trial." *Cont'l Grain Co. v. Frank Seitzinger Storage*, 837 F.2d 836, 838 (8th Cir.1988). Rule 56(e) requires "the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 56(e)).

The court's function on a motion for summary judgment is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Niagara of Wis. Paper Corp. v. Paper Indus.*

*Union–Mgmt. Pension Fund*, 800 F.2d 742, 746 (8th Cir.1986). " 'On summary judgment the inferences to be drawn from the underlying facts ... must be viewed in the light most favorable to the party opposing the motion.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962)); *Econ. Housing Co. v. Cont'l Forest Prods., Inc.*, 757 F.2d 200, 203 (8th Cir.1985). "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 257, 106 S.Ct. 2505. On the other hand, "[w]hen a motion for summary judgment is made and properly supported, the nonmoving party may not rely on bare allegations but must set forth specific facts showing that there is a genuine issue for trial." *LeBus v. Northwestern Mut. Life Ins. Co.*, 55 F.3d 1374, 1376 (8th Cir.1995).

## DISCUSSION

All Defendants have moved for summary judgment arguing there are no genuine issues of material fact and they are entitled to judgment as a matter of law.

## I. SCOTT COUNTY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

The Eighth Circuit affirmed summary judgment on (1) all § 1983 claims against Sheriff Bladel in his individual capacity; (2) all § 1983 supervisory claims against Bladel and Barton; and (3) the due process claims finding due process was observed in the execution of the writ. The claims which remain are the § 1983 individual capacity and conspiracy claims against Norris and Barton, as well as the

trespass and conversion claims against Norris. Scott County argues in light of the Eighth Circuit en banc opinion there are no genuine issues of material fact to support Audio Odyssey's § 1983 trespass or conversion claims.

First, Scott County argues that although the Eighth Circuit found the seizure became unreasonable when Norris gave the keys to the Bank on July 19, Norris is entitled to qualified immunity. Second, Scott County argues the § 1983 claim against Barton in his individual capacity must fail as a matter of law because Barton was not involved after July 14. Third, Scott County reasons Audio Odyssey was not deprived of a property right because the Lease Assignment allowed the Bank to take over the real estate in the event of default. Fourth, Scott County asserts there is no basis for a § 1983 claim because there was no state action in the continued possession of the premises after July 19. Fifth, Scott County argues the trespass and conspiracy claims were dismissed in the previous district court order which was not disturbed on appeal. Sixth, Scott County asserts Iowa Rule of Civil Procedure 1.257 protects the officers even if judgment were to be entered against them.

### A. Qualified Immunity

Audio Odyssey resists Scott County's motion arguing that Judge Loken did not discuss qualified immunity and Judge Hansen made no attempt to include qualified immunity as part of his joinder. Therefore, according to Audio Odyssey, the discussion of qualified immunity in Part IV B must be the holding of the court. Audio Odyssey asserts a jury must decide whether Norris acted reasonably in handing the keys over to the Bank on July 19.

This argument fails for two reasons. First, Judge Hansen explicitly rejected Part IV A *and* B of the panel opinion, *as well as* any other portion of the opinion which suggests the seizure was unreasonable *prior to* the time the inventory was completed. *Audio Odyssey* (en banc opinion), 286 F.3d at 503 ("In my view, the initial seizure was constitutionally reasonable, and ... only became unreasonable ... the following Wednesday afternoon after [the deputy] had inventoried the personal property for the purposes of the writ. To the extent the court's opinion can be read otherwise, I do not concur in it."). Therefore, the reinstated panel opinion must be read *excluding* all of Part IV A and B (including the qualified immunity discussion) *and* any other portion which reasons or implies that any state conduct was unreasonable before the inventory was complete.[6]

In addition, Audio Odyssey's qualified immunity argument fails because Part A of Judge Loken's "dissent" is the law of the case. *Audio Odyssey* (en banc opinion), 286 F.3d at 502[7] ("Judge Hansen's special concurrence joins Part A of this dissent, which is therefore the opinion of the court overruling Part IV A of the panel opinion.").

In Part A, Judge Loken states, "I put qualified immunity aside, because the merits of the Fourth Amendment issue are more important. It is clear that the sheriffs' faulty interpretation of the writ of

---

**6.** Furthermore, in Part IV B, the panel concedes that on remand, if raised, the qualified immunity defense would be a question of law for the *court* to decide. *Audio Odyssey* (panel opinion), 245 F.3d at 739 n. 19 ("[A]ny reassessment of qualified immunity will ultimately be a question of law for the court.").

**7.** For clarity, the Court does not refer to *Part A* of Judge Loken's en banc opinion as "dissenting" since it is in fact part of the majority opinion of the en banc court.

replevin is not dispositive—the Fourth Amendment issue turns on the objective reasonableness of their conduct, not on their subjective intent." *Id.* at 503. He goes on to find "there are two distinct reasons why the initial seizure was objectively reasonable." *Id.* First, "it was constitutionally reasonable for the sheriffs to construe the writ as authorizing them to close the store for a reasonable period while the replevied property was inventoried and removed." *Id.* Next, Judge Loken addresses the Lease Assignment signed by Audio Odyssey as a condition of the 1991 loan.

> [T]he lease assignment forecloses Audio Odyssey's claim that the initial entry violated its Fourth Amendment rights— because the Bank as assignee had the right to take possession of the leased premises 'using such force as may be necessary,' the deputy sheriffs acted in an objectively reasonable manner in helping the Bank take possession peaceably, at least for the purpose of removing its collateral.

*Id.*

Furthermore, and contrary to Audio Odyssey's assertion, Judge Loken does address qualified immunity. *Id.* at 503. Judge Loken states, "I do not share the court's view that deputy sheriffs who fail to parse a state court order with the legal acumen of lawyers and federal judges thereby lose the benefit of qualified immunity." *Id.* at 503 (citing *Saucier v. Katz,* 533 U.S. 194, 205–06, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)).[8]

Judge Loken continued his reasoning in Part B of his dissent and found the extended seizure was likewise constitutional. *Audio Odyssey* (en banc opinion), 286 F.3d

Citing Judge Loken's dissent in *Audio Odyssey,* the court reasoned, "[a]lthough we may not require officers to 'parse a state court order with the legal acumen of lawyers and federal judges,' we do require that, absent exigencies or consent—neither of which were present here—officers rely on the legal acumen of a neutral judicial officer in such disputes." *Id.* at 864 (quoting *Audio Odyssey* (en banc opinion), 286 F.3d at 503).

Audio Odyssey reasons that this statement somehow "limited" Judge Loken's "dicta" in the *Audio Odyssey* (en banc opinion). There is no basis for this assertion. In *Dixon,* the court pointed out that in *Audio Odyssey,* the officers *did* have a court order. *Id.* at 866 ("Unlike Audio Odyssey—where this court disagreed about whether seizure of a business pursuant to a writ of replevin for personal property was unreasonable—here there was no court order to seize any property."). The court further contrasted the officer's "reasonable" initial seizure in *Audio Odyssey* with the "unreasonable" conduct of the officers in *Dixon* where the officers were acting without an order of replevin and "commandeered the facility to the exclusion of the current possessor." *Id.* There is no indication that *Dixon* limited the holding in *Audio Odyssey.*

---

8. Audio Odyssey argues Part A of Judge Loken's en banc dissent was limited by *Dixon v. Lowery,* 302 F.3d 857, 864–65 (8th Cir.2002). The Court does not agree.

There, plaintiff Dixon brought a § 1983 claim against two police officers for a violation of his constitutional rights when they assisted a private party (Omar) in seizing Dixon's property. *Id.* Omar asked the officers if they were interested in an off-duty job which would require them to stand guard while the locks of a business were changed and the business was secured for renovations. *Id.* Despite Omar's admission that "he did not have a court order allowing him to take possession of the premises," the officers accepted the job without further investigating Omar. *Id.* at 863. The officers maintained their off-duty employment after the initial seizure of the property. *Id.* at 861.

The officers in that case did not challenge that "a seizure carried out without judicial authorization is per se unreasonable unless it falls within a well-defined exception ...." *Id.* at 862–63. Rather, the officers defended their action by arguing Dixon's continuing property interest was insufficient to support a constitutional violation. *Id.* at 863. The court found that argument fell short. *Id.* at 864.

at 504–505 (Loken, J., dissenting). However, Judge Hansen did not join the dissent in that conclusion. *Id.* at 502 (Hansen, J., specially concurring). Rather, he reasoned that a violation did occur when the keys were given to the Bank after the inventory was complete. *Id.* (Hansen, J., specially concurring). Therefore, the issue of whether Norris is entitled to qualified immunity for giving the keys to the Bank is before the Court and requires an application of the *Saucier* two-prong inquiry.⁹

"Qualified immunity is 'an entitlement not to stand trial or face the other burdens of litigation.'" *Saucier,* 533 U.S. at 200, 121 S.Ct. 2151. "In a suit against an officer for an alleged violation of a constitutional right, the requisites of a qualified immunity defense must be considered in proper sequence." *Id.* The first inquiry is whether, taken in the light most favorable to the party alleging injury, the facts alleged show the officer violated a constitutional right. *Id.* at 201, 121 S.Ct. 2151. If no constitutional right would have been violated even if the alleged facts were proven, then the inquiry ends. *Id.*

> On the other hand, if a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established. This inquiry, it is vital to note, must be undertaken in light of the specific context of the case, not as a broad general proposition; and it too serves to advance understanding of the law and to allow officers to avoid the burden of trial if qualified immunity is applicable.

*Id.*

In *Saucier v. Katz,* the plaintiff brought a § 1983 claim against Saucier, a military police officer, alleging Saucier used excessive force to arrest him. *Id.* at 199, 121 S.Ct. 2151. Saucier moved for summary judgment, pleading the affirmative defense of qualified immunity. *Id.* The district court denied the motion, finding "a dispute on a material fact existed concerning whether excessive force was used." *Id.* In arriving at that decision, the court concluded "the law governing excessive force claims was clearly established at the time of the arrest," and for Fourth Amendment purposes, " 'the qualified immunity inquiry is the same as the inquiry made on the merits.'" *Id.* at 199, 121 S.Ct. 2151 (citation omitted) (quoting App. to Cert. at 29a–30a).

The Ninth Circuit Court of Appeals affirmed, reasoning qualified immunity is a two-step analysis. *Id.* at 199, 121 S.Ct. 2151 (citing *Katz v. United States,* 194 F.3d 962, 967 (9th Cir.1999)). First, the court considers " 'whether the law governing the official's conduct was clearly established.'" *Id.* at 199, 121 S.Ct. 2151 (quoting *Katz,* 194 F.3d at 967). If the law was clearly established, the "second step is to determine if a reasonable officer could have believed, in light of the clearly established law, that his conduct was lawful." *Id.* The Ninth Circuit "concluded that the second step of the qualified immunity inquiry and the merits of the Fourth Amendment excessive force claim are identical, since both concern the objective reasonableness of the officer's conduct in light of the circumstances the officer faced on the scene." *Id.* at 200, 121 S.Ct. 2151 (citing *Katz,* 194 F.3d at 968).

The Supreme Court reversed, holding the violative conduct inquiry and the qualified immunity inquiry were distinct. *Id.* at 204, 121 S.Ct. 2151. For example, the excessive force standard requires the consideration of several factors including "the

---

**9.** *Audio Odyssey* (panel opinion), 245 F.3d 721, was decided April 6, 2001, and *Saucier* was decided June 18, 2001. Judge Loken's en banc dissent, rendered April 10, 2002, reflects this change in the law. *Audio Odyssey* (en banc opinion), 286 F.3d 498.

severity of the crime at issue, whether the suspect posed an immediate threat ... and whether he is actively resisting arrest." *Id.* at 205, 121 S.Ct. 2151.

> The qualified immunity inquiry, on the other hand, has a further dimension. The concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct. It is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts. An officer might correctly perceive all of the relevant facts but have a mistaken understanding as to whether a particular amount of force is legal in those circumstances. If the officer's mistake as to what the law requires is reasonable, however, the officer is entitled to the immunity defense.

*Id.*

■ The Supreme Court did not limit this analysis to "excessive force" cases; rather, the Court reasoned "[q]ualified immunity operates in this case, then, just as it does in [other Fourth Amendment cases], to protect officers from the sometimes 'hazy border between excessive and acceptable force,' and to ensure that before

they are subjected to suit, officers are on notice their conduct is unlawful." *Id.* at 206, 121 S.Ct. 2151 (quoting *Priester v. Riviera Beach,* 208 F.3d 919, 926–927 (11th Cir.2000)). Accordingly, it is the court's role to first determine whether an officer's mistaken belief about the legality of his conduct was reasonable, thereby entitling the officer to qualified immunity. *Id.* at 201, 121 S.Ct. 2151 (" '[W]e repeatedly have stressed the importance of resolving the immunity questions at the earliest possible stage in litigation.' ") (quoting *Hunter v. Bryant,* 502 U.S. 224, 227, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991)).[10]

The first step in the *Saucier* analysis is to determine whether a constitutional violation occurred. *Saucier,* 533 U.S. at 201, 121 S.Ct. 2151. In the present case, Audio Odyssey asserts a constitutional violation occurred because its real property was wrongfully seized. Scott County refutes this argument, stating no wrongful seizure of property occurred because the Lease Assignment gave the Bank the right to enter the premises.

The majority[11] of the Eighth Circuit agrees that the Lease Assignment gave the Bank the right of *initial* entry. *Audio Odyssey* (en banc opinion), 286 F.3d at 504

10. Audio Odyssey cites *Hummel v. City of Carlisle,* 229 F.Supp.2d 839 (S.D.Ohio 2002), and argues *Saucier* does not stand for the proposition that this court is called upon to resolve fact questions for the jury on qualified immunity. In *Hummel,* plaintiff brought a § 1983 action alleging the defendant police officers violated his constitutional rights during the issuance of several traffic citations; the officers asserted a qualified immunity defense. *Id.* at 843–46. One citation was issued for resisting arrest, but the record indicates no arrest or attempted arrest was ever made. *Id.* at 850. The court determined that the officer did not have probable cause to issue a citation for resisting arrest; therefore, a constitutional violation occurred. *Id.* Next, the court considered whether the officer was entitled to qualified immunity. *Id.* Applying

*Saucier,* the court reasoned that the doctrine announced in that case "has the effect of taking some jury questions away from the jury, but that is precisely why qualified immunity is a principle of *law,* not fact." *Id.* at 852–53.

Contrary to Audio Odyssey's assertion, the *Hummel* court did reason that *Saucier* requires the court to make a reasonableness inquiry as a matter of law before the case can ever get to a jury. *See id.*

11. Judge Hansen's express joinder with Part A of Judge Loken's en banc opinion necessarily includes the Lease Assignment allowing the *initial* seizure. Those portions of opinion which Judge Hansen agrees with are the majority opinion of the court.

("[T]he lease assignment forecloses Audio Odyssey's claim that the *initial* entry violated its Fourth Amendment rights . . . the deputy sheriffs acted in an objectively reasonable manner in helping the Bank take possession peaceably, at least for the purpose of removing its collateral.") (emphasis added).

However, the majority [12] does not agree the Lease Assignment gave the Bank the right to continue the seizure after the inventory was complete. *Id.* at 501 ("To the extent the lease assignment may be read to permit the Bank to take possession of the store premises in order to remove or sell the personalty, this right would not extend further than the writ of replevin the Bank actually obtained and executed."). Therefore, this Court is directed to find that a fact-finder could conclude a constitutional violation occurred when the Bank was left in possession of the real property after the inventory was completed. The next question in the qualified immunity analysis is whether the mistaken belief of the official or officials involved in that constitutional violation was reasonable under the circumstances.[13] *Saucier*, 533 U.S. at 201, 121 S.Ct. 2151.

## B. Sergeant Barton's Qualified Immunity Argument

Scott County argues Sergeant Barton cannot be liable under § 1983 in his individual capacity since the Eighth Circuit found no constitutional violation occurred during Barton's involvement. Attempting to resurrect an argument which has been foreclosed upon by the Eighth Circuit, Au-

dio Odyssey argues that on July 14, Barton was aware he was being asked to act beyond the scope of the court order because he admits he did not stop to think about the scope of the replevin order. Since the Eighth Circuit determined the execution of the replevin order was reasonable, Barton's state of mind in executing the order is no longer relevant.

The undisputed facts show Barton was only involved with the replevin action on July 14. The Eighth Circuit found no constitutional violation occurred until the keys were given to the Bank on July 19. Since no constitutional violation occurred as a result of Barton's conduct, he is entitled to summary judgment. *Id.* at 201, 121 S.Ct. 2151 ("If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity.").

■ Audio Odyssey also argues Barton was involved after July 14 because he instructed Norris to post the No Trespassing signs which remained posted until August 31. Barton was not somehow continually linked to the replevin simply by instructing Norris to post the signs any more than he was linked by handing Norris the paperwork. Furthermore, this allegation forms the basis of a supervisory claim against Barton, and the Eighth Circuit affirmed summary judgment on *all* supervisory claims. *See Audio Odyssey* (panel opinion), 245 F.3d at 742 ("As explained above, there is no showing of previous illegalities that place Sheriff Bla-

---

12. Because Judge Hansen *does not* join Judge Loken in finding the Bank's Lease Assignment allowed the extended seizure, *Audio Odyssey* (en banc opinion), 286 F.3d at 503, he necessarily joins Judge Lay et al. on this issue.

13. The record regarding whether the Scott County Defendants relied upon or knew of the Bank's Lease Assignment is unclear. The

Court must view the facts in the light most favorable to the non-movant, *Matsushita Elec. Indus. Co.*, 475 U.S. at 587–88, and will not consider the Lease Assignment as it applies to Scott County's motion for summary judgment. The Bank's Lease Assignment as it applies to the other Defendants will be discussed *infra*.

del on the requisite notice. The supervisory claim against him necessarily fails. A similar claim against Sergeant Barton for improperly supervising Deputy Norris fails for the same reason.").

For the above stated reasons, Defendant Barton's motion for summary judgment must be granted.

### C. Deputy Norris' Qualified Immunity Argument

Scott County argues Norris is entitled to qualified immunity because under the circumstances, a reasonable official in his position would not have known that giving the keys to the Bank after the inventory was completed would violate Audio Odyssey's constitutional rights. Audio Odyssey argues this is question for the jury. However, *Saucier* requires that the court must first determine as a matter of law whether the official's mistaken belief regarding the law was reasonable in light of the circumstances. *Saucier*, 533 U.S. at 207–08, 121 S.Ct. 2151.

In determining whether Norris' mistake was reasonable, it is important to consider the events leading up to July 19. The following occurred during the initial seizure, which the law of the case holds was reasonable: (1) Norris posted the No Trespassing signs; (2) Norris carried out the Bank's replevin instructions on Friday, July 14; (3) Norris allowed the Bank's locksmith to change the locks on July 14; and (4) Norris allowed the Bank to oversee the collateral inventory through Wednesday, July 19. The question is whether, in light of these events, it was also reasonable for Norris to believe he was not violating Audio Odyssey's constitutional rights when he turned the keys over to the Bank on July 19.

■ Handing the keys to the Bank was consistent with the *reasonable* events of the previous six days; therefore, it is illogical to find Norris made an unreasonable mistake in doing so. As stated at the hearing, if the nine judges of the Eighth Circuit were split 4–1–4 on whether handing the keys to the Bank was reasonable, how can the Court ever find that Norris, a deputy sheriff, had to recognize it was unreasonable as a matter of law? *Compare Duluth News–Tribune v. Medure*, 808 F.Supp. 671, 675 (D.Minn.1992) (finding the deputy sheriff was entitled to qualified immunity because "[a] reasonable official would not have understood that retrieving the transcript, to which no one other than a court official was entitled, would operate as a prior restraint or violate any other clearly established first amendment law"), *with Dixon*, 302 F.3d at 864–65 (finding officers were not entitled to summary judgment based on qualified immunity because reasonable officers would have known plaintiff's constitutional rights were being violated where the off-duty officers commandeered the premises *without a writ* to the exclusion of the owner and *personally* occupied the premises for more than three weeks).

The Court finds, under the circumstances known to Norris on July 19, including the reasonable events of the preceding six days, Norris' mistaken belief that he was not violating Audio Odyssey's constitutional rights by giving the keys to the Bank was reasonable. Norris is entitled to qualified immunity as a matter of law.

Deputy Norris' motion for summary judgment on all remaining counts against him must be granted.[14]

---

**14.** The Court finds Deputy Norris is entitled to qualified immunity and does not reach Scott County's alternative argument regarding Iowa Rule of Civil Procedure 1.257.

## II. LAW FIRM DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

The Law Firm Defendants ("Law Firm") renew their motion for summary judgment, arguing that in light of the Eighth Circuit opinion, they are entitled to judgment as a matter of law on all remaining counts. Two § 1983 claims against the Law Firm remain, one against Hofmann in his individual capacity and the other against Hofmann for conspiracy.

The Law Firm is a private rather than a state actor, and as the Eighth Circuit reasoned in the *Audio Odyssey* panel opinion,

Private conduct is actionable under section 1983 under two conditions. First, the constitutional deprivation at issue 'must be caused by the exercise of some right or privilege created by the State . . . .' *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982) (describing the right to seek a garnishment or attachment as qualifying). Second, the private party must have 'acted together with or . . . obtained significant aid from state officials' or engaged in conduct that is 'otherwise chargeable to the State.' *Id.; Wyatt v. Cole*, 504 U.S. 158, 162, 112 S.Ct. 1827, 118 L.Ed.2d 504 (1992). The second element requires more than the private misuse of a state statute (as alleged in the taking of the personal property in this case); a plaintiff must show that the private party acted in concert with or obtained significant aid from state officials who were themselves involved in a constitutional violation. *See Hassett v. Lemay Bank & Trust Co.*, 851 F.2d 1127, 1129–30 (8th Cir.1988); *Apostol v. Landau*, 957 F.2d 339, 343 (7th Cir. 1992). Otherwise stated, there must be a 'meeting of the minds' or a 'mutual understanding' between a private party and public officials to engage in conduct that violates the plaintiff's federal rights.

*Miller v. Compton*, 122 F.3d 1094, 1098 (8th Cir.1997).

*Audio Odyssey* (panel opinion), 245 F.3d at 739–40.

The Law Firm argues no triable issues remain because the Eighth Circuit ruled the initial seizure on July 14 was constitutional and the Law Firm had no involvement after that date. Alternatively, the Law Firm argues that as a private actor, they are not liable under § 1983 where there was no continuing state action after July 19.

Audio Odyssey resists this motion, arguing Part IV C of the panel opinion was reinstated, and therein the panel found Audio Odyssey's conspiracy claims survived summary judgment.

Audio Odyssey has clearly made a sufficient showing to survive summary judgment. A reasonable jury could find a 'meeting of the minds' between Bank's loan officer and vice-president Bradley and attorney Hofmann, on one hand, and Sergeant Barton and Deputy Norris, on the other, to seize Audio Odyssey's real estate even though the state court ordered no such thing. Indeed, on the present record, the idea appears to have been Bradley's to begin with.

*Audio Odyssey* (panel opinion), 245 F.3d at 740.

Audio Odyssey's reliance on this portion of the panel opinion is unjustified. Therein, the panel reasons the initial seizure was unreasonable, therefore, that portion of the panel opinion was not reinstated per Judge Hansen's special concurrence. *Id.* (Hansen, J., specially concurring).

I concur in the court's reinstatement of the prior panel opinion, . . . except I do not concur in those portions of Part IV A and Part IV B of the prior panel opinion which hold that the initial execution of the writ of replevin . . . constitut-

ed an unreasonable seizure .... *To the extent the court's opinion can be read otherwise, I do not concur in it.*

*Id.* (Hansen, J., specially concurring) (emphasis added).

As an alternative argument for attaching liability to the Law Firm, Audio Odyssey advances its "freight train" theory. Therein, Audio Odyssey argues the Law Firm defendants cannot "start the train down the track and then claim that they had no involvement with the ensuing train wreck." Audio Odyssey suggests that by representing the Bank in the state court replevin action, the Law Firm was involved in the extended seizure of the real estate.

■ The Court disagrees because, to extend the freight train illustration, the train wreck would have to occur prior to July 19 to be connected to the actions of the Law Firm. The presence of the Law Firm in the continuing litigation related to the replevin was separate from the seizure and did not constitute new acts on the part of the Law Firm, apart from representing the interests of a client, to extend the possession of the premises. Nothing in the Eighth Circuit opinions suggests differently. Audio Odyssey does not point to any affirmative conduct on the part of the Law Firm in maintaining the seizure of the real estate. It was the extended seizure, not the replevin litigation, the Eighth Circuit found to be a constitutional violation. Therefore, Audio Odyssey cannot attach an unconstitutional act to the Law Firm. Audio Odyssey's allegations and suppositions regarding the Law Firm are simply not enough to survive a motion for summary judgment. *LeBus,* 55 F.3d at 1376 ("the nonmoving party may not rely on bare allegations but must set forth specific

facts showing that there is a genuine issue for trial.").

The facts are undisputed; the only evidence in the record or advanced by Audio Odyssey of the Law Firm's involvement in the replevin action took place on July 14. This Court cannot conclude that by maintaining some presence in continuing, related litigation, on behalf of a client, the Law Firm was taking additional actions to extend the possession of the premises by the Bank. The Eighth Circuit found the initiation and execution of the replevin action was constitutionally permissible. Therefore, the Law Firm was cut off from any unconstitutional act and Audio Odyssey's "freight train" theory fails.[15] As the Eighth Circuit reasoned, "[i]f the state actors did not violate the Fourth Amendment, then Audio Odyssey has no § 1983 claim against their alleged private conspirators, the [sic] Brenton Bank and its officers and attorney." *Audio Odyssey* (en banc opinion), 286 F.3d at 502 (Loken, J., dissenting) (citing *Johnson v. Outboard Marine Corp.,* 172 F.3d 531, 536 (8th Cir. 1999)).

For the reasons stated above, the Law Firm Defendants' motion for summary judgment must be granted.

## III. THE BANK DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

The following claims remain against the Bank Defendants: Count I (§ 1983 claim against Brenton Bank); Count II (§ 1983 claim against Bradley); Count III (§ 1983 claim against Pieper); Count X (§ 1983 conspiracy claim against Brenton, Bradley, and Pieper); and Counts XI–XXI (various state law claims). The Bank Defendants renew their motion for summary judg-

---

**15.** The only other claim against the Law Firm Defendants is abuse of process. Judge Longstaff granted summary judgment in favor of the Law Firm Defendants on this claim which was not reversed by the Eighth Circuit.

ment, arguing they are entitled to judgment as a matter of law because the § 1983 and the state law claims fail.

Audio Odyssey advances several theories in resistance to the Bank's motion, most of which have been foreclosed by the Eighth Circuit. As the Court explained at the hearing, it matters not whether Audio Odyssey agrees with the Eighth Circuit rulings, this Court must follow them.

## A. The Dincers' Standing

Audio Odyssey argues the Dincers do have standing based on their contractual relationship with the Bank. This argument clearly fails. The very first holding of the Eighth Circuit was that the Dincers lacked standing. "As a threshold matter, we hold that the Dincers lack individual standing to sue defendants for the replevin. It is well established that a shareholder or officer of a corporation cannot recover for legal injuries suffered by the corporation." *Audio Odyssey* (panel opinion), 245 F.3d at 729.

## B. Defective Original Notice

Next, Audio Odyssey argues: (1) the state court never had personal jurisdiction in the replevin action because the original notice was not properly served; (2) the

Bank did not have the right to possess either Audio Odyssey's personal property nor their premises on July 14 because it was not properly served; (3) Judge Havercamp's issuance of the replevin order had the effect of rendering a judgment against Audio Odyssey; and (4) the Bank did not have a contractual right to enforce the SA because the SBA never gave written consent to accelerate the loan.

■■■ Audio Odyssey's arguments regarding original notice fail. First, neither Iowa nor federal law require service of original notice prior to a prejudgment writ of replevin as long as other procedures to guarantee protection against erroneous seizures are in place. *See Mitchell v. W.T. Grant Co.*, 416 U.S. 600, 605–06, 94 S.Ct. 1895, 40 L.Ed.2d 406 (1974) (" 'It is sufficient, where only property rights are concerned, that there is at some stage an opportunity for a hearing and a judicial determination.' "); Iowa Code § 643.1 (2001). *See Thorp Credit, Inc. v. Barr*, 200 N.W.2d 535, 536 (Iowa 1972) (finding replevin defendant did not have standing to challenge the original notice because he moved to dismiss the action and participated in the trial).[16] The Eighth Circuit

---

16. Audio Odyssey argues the replevin statute requires that a replevin action be tried according to "ordinary proceedings", which means according to the Iowa Rules of Civil Procedure. Therefore, according to Audio Odyssey, because the original notice was not properly served, those proceedings were not followed and personal jurisdiction was lacking in the replevin action.

Audio Odyssey fails to recognize that under the Iowa Rules of Civil Procedure, a defendant waives his right to challenge the original notice if, as here, he appears in the action. Audio Odyssey waived its right to challenge personal jurisdiction on August 4, 1995, by filing a motion to dismiss requesting, inter alia, affirmative relief. Bank Defendants.' App. in Supp. of Mot. for Summ. J. at 129.

Wherefore, the defendant, Audio Odyssey, Ltd., ... respectfully requests that this

court grant this Motion to Dismiss *and* enter an Order requiring the Sheriff to return the real estate and all its contents to the defendant, to preserve the bond for the purposes set forth in § 643 and to allow the preservation of any other rights defendant may have.

*Id.* (emphasis added). *See Nationwide Eng'g & Control Sys., Inc. v. Thomas*, 837 F.2d 345, 347 (8th Cir.1988) (applying Iowa law and finding "[i]f the appearing party requests relief or discloses a purpose that goes beyond challenging the jurisdiction of the court over the subject matter or the parties, the appearance will be considered general, and all jurisdictional challenges will be deemed waived.") (citing *In re Estate of Dull*, 303 N.W.2d 402, 407 (Iowa 1981)).

found Iowa's replevin statute provided these protections and was constitutional. *See Audio Odyssey* (panel opinion), 245 F.3d at 735. Furthermore, the Eighth Circuit also found the replevin order was properly issued; therefore, these arguments have been settled. *Id.*

### C. No Exigent Circumstances

Audio Odyssey next argues there were no exigent circumstances necessitating an ex parte replevin action. This issue was addressed by the Eighth Circuit. It found that Hofmann presented a sufficient explanation to the state court judge as to why an ex parte action was necessary. *Audio Odyssey* (panel opinion), 245 F.3d at 733–34 ("The Bank knew that Audio Odyssey was planning an 'annual sale' the following day, and that much or all of the collateral was in danger of being sold. Hofmann's oral statement adequately apprised the judge of this exigent circumstance.")

### D. Written Permission Required to Accelerate the Loan

Audio Odyssey next argues the Bank did not follow federal law because the SBA's prior written authorization was required before the Bank could accelerate the loan. In the companion to this case, *Audio Odyssey, Ltd. v. United States,* this Court ruled that written consent was not required. *Audio Odyssey, Ltd. v. United States,* 243 F.Supp.2d 951, 969 (S.D.Iowa 2003).

> In the present case, Brenton, as holder of the note, could have required SBA to provide written consent to foreclose on the loan. However, Brenton did not require written consent; rather, it acted upon the oral consent given it by the SBA (Hoffman) during the July 12, 1999, telephone conversation. Because Audio Odyssey is a third-party beneficiary to the 1978 Loan Guaranty, it steps into

the shoes of Brenton; Brenton waived its right.

*Id.*

Furthermore, the Eighth Circuit found the initial replevin action was constitutional, which forecloses upon Audio Odyssey's argument regarding the initiation of the replevin.

### E. § 1983 Claims

On remand, the § 1983 claims against the Bank have a different posture than the § 1983 claims against the Law Firm. The Bank, unlike the Law Firm, *was* involved in the extended seizure which the Eighth Circuit found to be unconstitutional. As reasoned in Part II *supra,* Norris was entitled to qualified immunity because his mistake in giving the keys to the Bank was reasonable under the circumstances; however, this does not insulate the Bank.

Nonetheless, the Bank argues it is entitled to summary judgment because the Lease Assignment allowed Brenton to enter the premises and remove all property listed as collateral for the loan. Therefore, the Bank asserts Audio Odyssey's § 1983 claims must fail since the Bank's possession of the premises did not constitute a seizure under the Fourth Amendment.

The Lease Assignment states in pertinent part:

> 4. In the event of any default by Borrower [Audio Odyssey] in the performance of any of the obligations of [its] note to Assignee [the Bank] evidencing the aforesaid loan, any renewal or extension thereof, or any other agreement made in connection therewith, including [its] agreements herein, then, Assignee, at its option, may, without notice, using such force as may be necessary, enter said leased premises and do any one or more of the following:

a. Remove all property of Borrower therefrom that is hypothecated as collateral for its aforementioned loan.

b. Sell the property referred to in paragraph a. on said premises.

c. Transfer and assign said lease and Borrower's rights therein to parties satisfactory to Assignee . . . .

*Audio Odyssey* (en banc opinion), 286 F.3d at 503–04.

Audio Odyssey disputes that the Bank has rights pursuant to this Lease Assignment for two reasons. First, the landlord did not sign or consent to the Lease Assignment and second, the Eighth Circuit suggested that this same argument failed in *Fuentes v. Shevin*, 407 U.S. 67, 94, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972).

### 1. Landlord's Consent

The majority of the Eighth Circuit found the absence of the landlord's signature did not defeat the Lease Assignment:

Audio Odyssey argues that the Assignment of Real Estate Lease was invalid because the store's landlord never signed it. I disagree. In general, 'an express restriction against an assignment does not render an assignment void as between the lessee and the assignee, and as between such parties it is still effectual to carry the interest of the lessee.' 49 Am.Jur.2d, *Landlord & Tenant* § 1110 (1995). That principle should certainly apply here, because Audio Odyssey's promise to assign the lease in the event of default was a precondition to obtaining the bank loan and SBA guarantee. Moreover, a landlord who is entitled to reject a lease assignment waives that right and consents to the assignment if he does not object promptly. *See* Restatement (Second) of Property: *Landlord & Tenant* § 15.2 cmt. f (1977). Here, the store's landlord knew no later than July 24 that the Bank had taken possession. Rather than object, the landlord billed the Bank for unpaid rent in October, consistent with a waiver of any right to object. *Audio Odyssey* (en banc opinion), 286 F.3d at 504.

Furthermore, Audio Odyssey's own Business Property Lease Agreement ("BPLA") with landlord Frank Brown did not preclude such assignments. The BPLA states in pertinent part:

ASSIGNMENT AND SUBLETTING. Any assignment of this lease or subletting of the premises or any part thereof, without the Landlord's written permission shall, *at the option of the Landlord,* make the rental for the balance of the lease term due and payable at once. Such written permission shall not be unreasonably withheld.

Clearly, Audio Odyssey had the right to assign the lease *without* written permission. Although Audio Odyssey states Frank Brown did not consent and in fact was outraged when the Bank seized the premises, Brown's outrage did not stop him from billing and collecting rent from the Bank. Audio Odyssey's argument that the Lease Assignment did not give the Bank the right to *initially* enter and possess the premises fails.

### 2. Fuentes

Audio Odyssey bases its second argument on the panel's *suggestion* that a similar argument failed in *Fuentes. See Audio Odyssey* (panel opinion), 245 F.3d at 741 n. 22 ("We observe that *Fuentes* rejected an argument similar to Hofmann's.") (citing *Fuentes,* 407 U.S. at 95–96, 92 S.Ct. 1983). However, Audio Odyssey does not argue or even attempt to reason how the facts of *Fuentes* apply to the present case.

*Fuentes* is, in fact, distinguishable from the present case. In*Fuentes,* the Supreme Court considered the constitutionality of the Pennsylvania and Florida prejudgment

replevin statutes. *Fuentes*, 407 U.S. at 69–70, 92 S.Ct. 1983. Fuentes, the Florida plaintiff, purchased appliances pursuant to a conditional sales contract. *Id.* at 70, 92 S.Ct. 1983. When the outstanding balance of Fuentes' loan was about $200, a dispute arose between Fuentes and the lender, and Fuentes stopped making payments. *Id.* Without providing Fuentes prior notice, the lender obtained a writ of replevin and had the sheriff seize the appliances. *Id.*

Fuentes filed an action challenging Florida's replevin statute as an unconstitutional deprivation of her right to due process. *Id.* One of the arguments advanced in defense of the action was that Fuentes had waived her right to due process by signing the conditional sales contract. *Id.* at 94, 92 S.Ct. 1983. The Supreme Court found that under the circumstance, the debtor could not have known she was waiving her constitutional right. *Id.*

First, the Court found there was "no bargaining over contractual terms" and the contracting parties "were far from equal in bargaining power." *Id.* at 95, 92 S.Ct. 1983. Second, the Court found the default provisions were vague, in fine print, and part of a preprinted form. *Id.* Third, the Court reasoned that the provision did not put the consumers on notice they were waiving their constitutional rights. *Id.*

Those concerns are not present in this case. First, there was not "great disparity in bargaining power" between Audio Odyssey and the Bank. *Id.* Dincer stated that Audio Odyssey's gross sales had been between $700,000 to $1.3 million. In addition, Audio Odyssey was a retail electronics store which sold top end, big ticket electronics equipment. Dincer undoubtedly negotiated many contracts and credit applications which themselves had default provisions. Second, the Lease Assignment was a separate document and required a separate signature. Third, although the Lease Assignment was on a preprinted form, specific provisions were typed in, including the parties names, Audio Odyssey's property description, and the loan amount. The print was not exceptionally small, and the terms were not vague. Fourth, the provisions *clearly* put Audio Odyssey on notice that in the event Audio Odyssey defaulted in the performance of the terms of its note, the Bank "at its option, may, without notice, using such force as may be necessary, enter said leased premises." The contract at issue in *Fuentes* is demonstrably different than the Lease Assignment at issue here. Furthermore, in *Fuentes*, the sales contract argument was advanced to demonstrate that even if the Florida statute did not provide due process, plaintiff had waived her right by signing the contract. *Id.* Here, the Iowa replevin statute was found to provide due process, so no such argument was necessary.

However, these arguments, though persuasive to this Court, cannot obtain summary judgment for the Bank. Rather, the law of the case precludes this Court from finding the Lease Assignment necessarily allowed the Bank to *continue* the seizure after the inventory was completed on July 19.[17] Judge Hansen parted company at Part B of the en banc dissent wherein Judge Loken found that the Lease Agree-

---

17. The Bank argues the Eighth Circuit panel found the district court had not ruled on the significance of the Lease Assignment, leaving the parties "free to urge their positions before the district court," *Audio Odyssey* (panel opinion), 245 F.3d at 741. However, the subsequent en banc opinion considered the Lease Assignment and reasoned it did not allow the Bank to possess the premises after the inventory was complete. *Audio Odyssey* (en banc opinion), 286 F.3d at 501.

Furthermore, on remand, the Bank has not advanced any legal or factual argument to controvert the en banc majority's reasoning that the Lease Assignment did not allow the *extended* seizure.

ment allowed the *extended* seizure. *See Audio Odyssey* (en banc opinion), 286 F.3d at 504 (Loken, J., dissenting). Therefore, Judge Hansen necessarily joined the other four judges in the en banc opinion, reasoning:

> To the extent the lease assignment may be read to permit the Bank to take possession of the store premises in order to remove or sell the personalty, this right would not extend further than the writ of replevin the Bank actually obtained and executed. And even if the lease assignment permitted the Bank to transfer possessory interest to another party, the facts of this case reveal the Bank never took such action. Thus, the arguments advanced above explain adequately why the defendants' seizure under that writ was constitutionally impermissible.

*Audio Odyssey* (en banc opinion), 286 F.3d at 501.

The panel did not reach the issue of whether private actors were entitled to good faith immunity in § 1983 actions. *See Audio* (panel opinion), 245 F.3d at 740 ("We need not decide whether to recognize such a defense, or define its scope, because doing so would not assist the private defendants. Any immunity that might apply would be no broader than the qualified immunity accorded public officials") (citing *Wyatt*, 504 U.S. at 167–69, 112 S.Ct. 1827). The panel also stated, "[w]e have not squarely addressed this question, although other circuits have answered it affirmatively." *Id.* (citing *Pinsky v. Duncan*, 79 F.3d 306, 313 (2d Cir.1996)); *Jordan v. Fox, Rothschild, O'Brien & Frankel*, 20 F.3d 1250, 1276 (3d Cir.1994); *Wyatt v. Cole*, 994 F.2d 1113, 1118 (5th Cir.1993).

Although this would be a case of first impression, after reconciling the Eighth Circuit opinions, the Court finds it is un-

necessary to decide whether a good faith immunity defense is available to the Bank Defendants. The Bank accomplished its goal of securing the collateral on July 19. Norris gave the Bank the keys and had no more involvement. The Bank lingered on the premises without adequate explanation in this record. Although it has had the opportunity to explain to the Court why it was necessary to extend its occupation of the premises, it has not done so. As the en banc opinion pointed out, the Lease Assignment allowed the Bank to enter the premises and do one or all of three things: remove the collateral, sell the collateral, and/or assign the lease. The Bank only chose to do the first. It has not presented to the Court evidence that it was in the process of selling other inventory that could not be removed, or attempting to assign or transfer the lease. Rather, it simply occupied the premises for six weeks to the exclusion of the Plaintiffs.

■ The remaining question is whether by extending the seizure, the Bank " 'acted together with or . . . obtained significant aid from state officials' or engaged in conduct that is 'otherwise chargeable to the State.' " *Lugar*, 457 U.S. at 937, 102 S.Ct. 2744. Clearly the Bank *initially* received aid from the state and receiving the keys from Norris certainly constitutes aid from the state. Although the Court found Norris' *mistake* in giving the keys to the Bank under the circumstances was reasonable, nonetheless it was a mistake. The record also shows the Bank, not the Sheriff's officers, maintained the No Trespassing signs. At the bottom of the No Trespassing signs appear the words, "By Order of Mike Bladel, Sheriff Scott County, Iowa". By leaving these signs in the door, the Bank created the appearance that the Sheriff, who posted those signs originally, was still involved in the seizure.[18] Although this

---

18. The Court does not reach the question of whether posting this type of No Trespassing

sign generally creates state action. As the

seems a minimal showing, the Court cannot find, as a matter of law, the Bank was not benefitting from state authority in extending the seizure of Audio Odyssey's real property. This Court is unable to reconcile a contrary conclusion with the opinion of the Circuit Court, which this Court must follow.

The Court cannot find, on these facts, the Bank had any good faith reason for believing the Lease Assignment entitled it to *indefinitely* occupy the premises. The Court finds even if good faith immunity were an available legal argument for the Bank Defendants, on the facts in the record and in accord with the directions from the Eighth Circuit, such a defense is not available to them.

In the light most favorable to Audio Odyssey, the Court finds there are genuine issues of fact on the § 1983 claims. The Bank Defendant's motion for summary judgment on Counts I, II, III, and X must be denied.

### F. Pendent State Claims

In addition to the § 1983 claims, Audio Odyssey asserts ten pendant state law claims against the Bank. The Bank has moved for summary judgment on all those claims.

### 1. Trespass

Trespass is the "[e]ntering or remaining upon or in property without justification after being notified or requested to abstain from entering or to remove or vacate therefrom by the owner, lessee, or person in lawful possession, ..." Iowa Code § 716.7(2)(b). "The gist of a claim for trespass on land is the wrongful interference with one's possessory rights in property." *Robert's River Rides, Inc. v.*

*Steamboat Dev. Corp.*, 520 N.W.2d 294, 301 (Iowa 1994).

■ The Court has assumed, as it must given the Eighth Circuit opinions, that Audio Odyssey's rights were violated when the real estate seizure was extended. As reasoned above, questions of material fact exist whether the Lease Assignment allowed the Bank to continue occupying the real estate six weeks after the replevin was completed. In this case, the § 1983 claims and the trespass claim are conceptually inseparable as they both regard Audio Odyssey's right to possess the real estate. A question of fact remains regarding the Bank's responsibility in the extended seizure of Audio Odyssey's real property interest; similarly, a question of fact exists regarding the tort trespass claim.

The Court finds a genuine issue of material fact exists; therefore, the Bank Defendants' motion for summary judgment on the trespass claim must be denied.

### 2. Conversion

"Conversion is the act of wrongful control or dominion over another's personal property in denial of or inconsistent with that person's possessory right to the property." *Ezzone v. Riccardi*, 525 N.W.2d 388, 396 (Iowa 1994). Audio Odyssey argues that the Eighth Circuit found conversion. *See Audio Odyssey* (en banc opinion), 286 F.3d at 500–01 (discussing Audio Odyssey's interest in the *leasehold* over which the Bank did not have a security interest nor did the replevin apply).

The Bank replies that Audio Odyssey has misstated the Eighth Circuit's findings; it did not find the Bank unreasonably deprived Audio Odyssey of *personal*

Scott County Defendants pointed out, similar signs are handed out by sheriff's departments throughout the state without much, if any, involvement in the circumstances of posting.

However, in the present case, the signs were originally posted by Scott County Sheriff's Deputy Norris.

*property.* Instead, the Bank claims the Eighth Circuit affirmed the district court's grant of summary judgment on the federal claims regarding Audio Odyssey's personal property. *See Audio Odyssey* (panel opinion), 245 F.3d at 729 ("We also agree with the district court's grant of summary judgment on the federal claims regarding Audio Odyssey's personal property.").

The SA gave the Bank the right to seize Audio Odyssey's personal property upon default. The Bank argues Audio Odyssey was in default on July 14 because Audio Odyssey's mortgage payments were past due, its insurance policy covering the collateral had been cancelled, and it was behind in its taxes.

Audio Odyssey argues if the Bank had properly applied the deposit made by Dincer on July 13, the mortgage would have been current. Audio Odyssey also argues the insurance policy was not set to cancel until July 27, 1995. However, Audio Odyssey admits that it was clearly in default with regard to its taxes.

■ The Court finds the Bank did not cause a wrongful interference with Audio Odyssey's personal property because it had a contractual right to seize it. Accordingly, the Bank's motion for summary judgment on the conversion claim must be granted.

### 3. Intentional Interference with Existing and Prospective Contractual Relations

Audio Odyssey argues that the Bank knew some of the property it seized was subject to superior security interests; therefore, seizure of that property suggests the Bank intentionally interfered with Audio Odyssey's contractual relationships.

The Bank argues there is no evidence the Bank's replevin action was motivated by a desire to improperly interfere with Audio Odyssey's contractual relations; the Bank was seeking to enforce its SA which entitled the Bank to all property securing Audio's note. Any interference with Audio Odyssey's contractual relations was incidental to the Bank's lawful action. *See, e.g., Preferred Mktg. Assocs. Co. v. Hawkeye Nat'l Life Ins. Co.,* 452 N.W.2d 389, 396 (Iowa 1990) (finding plaintiff's inability to realize a profit "was incidental to the pursuit of [defendant's] own ends by proper means" and not actionable).

Intentional interference with existing relations and prospective relations are essentially the same cause of action. *Burke v. Hawkeye Nat. Life Ins. Co.,* 474 N.W.2d 110, 114 (Iowa 1991).

> Intentional interference with a contract requires proof that (1) plaintiff had a contract with a third party; (2) defendant knew of the contract; (3) defendant intentionally and improperly interfered with the contract; (4) the interference caused the third party not to perform, or made performance more burdensome or expensive; and (5) damage to the plaintiff resulted. Proof of intentional interference with a prospective contract or business relationship essentially calls for evidence on [sic] the same elements relative to future business.
>
> The primary distinction between the two causes of action is the nature and degree of proof required on the element of motive. In a claim of intentional interference with a prospective business advantage, plaintiff must prove that the defendant intended to financially injure or destroy the plaintiff. In cases of interference with existing contracts, proof of such purpose is not essential.

*Id.* (citations omitted) (citing *Nesler v. Fisher and Co., Inc.,* 452 N.W.2d 191, 196–99 (Iowa 1990)).

Audio Odyssey asserts it can show all these elements because (1) it had contracts with suppliers, customers, and even em-

ployees; (2) the Bank knew of these contracts; (3) it is obvious the Bank intentionally and improperly interfered; (4) as a result, various third parties breached their contracts with Audio Odyssey or rendered Audio Odyssey's performance impossible; and (5) Audio Odyssey was damaged. Audio Odyssey argues that it does not have to prove the Bank intended to financially injure or destroy Audio Odyssey to prevail.

On both causes of action, to survive a motion for summary judgment, Audio Odyssey must do more than make conclusory arguments. *Robert's River Rides, Inc.,* 520 N.W.2d at 304 ("The party resisting summary judgment 'must set forth specific facts constituting competent evidence to support a prima facie claim.'") (quoting *Hoefer v. Wisconsin Educ. Ass'n Ins. Trust,* 470 N.W.2d 336, 339 (Iowa 1991)). Audio Odyssey has not pointed to any evidence in the record that the Bank had the intention of interfering with Audio Odyssey's *contracts,* existing or future. There is no evidence to suggest the Bank was doing anything other than pursuing *its own* contractual rights under the SA. To prevail on a claim of interference with prospective contractual relations, Audio *does* have the additional burden of proving the Bank intended to financially injure or destroy Audio. *Burke,* 474 N.W.2d at 114.

▮ The Court finds Audio Odyssey has not met its burden of showing the essential elements of either intentional interference with existing contractual relations or prospective contractual relations. Accordingly, the Bank's motion for summary judgment on these claims is granted.

**4. U.C.C. Commercial Reasonableness**

In its complaint, Audio Odyssey alleges the Bank failed to act commercially reasonable as required by Iowa Code § 554.9504 (now 554.9610). Audio Odyssey argues there are disputes of fact regarding whether the Bank fulfilled its "duty" to not take possession of the collateral, and whether Audio Odyssey was actually in default. For these reasons, Audio asserts the Bank did not act commercially reasonable. Audio Odyssey also argues the fact that the Bank retained the property for eight years before disposing of it is commercially unreasonable.

▮ The Bank asserts Audio Odyssey's arguments are without merit. First, the Bank points out that it is undisputed that Audio Odyssey had not paid its taxes; the SA gave the Bank the right to recover its collateral on that basis alone. Second, Audio is misapplying the statute; the Bank has not sought any deficiency from Audio Odyssey, therefore, claiming the Bank acted commercially unreasonable under Iowa Code § 554.9504 fails as a matter of law.[19]

The Bank had a valid contract upon which it carried out a seizure of collateral pursuant to Iowa law which the Eighth Circuit ruled was constitutional. Furthermore, Audio Odyssey misapplies the statute; Iowa Code § 554.9504 addresses the creditor's conduct in the *disposition* of collateral after default, not the creditor's conduct toward the debtor in initiating a replevin action. Audio Odyssey asserts claims that either do not exist or belong to others.[20]

19. If the Bank sought to recover a deficiency from Audio Odyssey after the disposition of the collateral, the Bank would have been required to show it acted commercially reasonable in disposing of the collateral. *See Beneficial Finance Co. of Black Hawk County v. Reed,* 212 N.W.2d 454, 459 (Iowa 1973).

20. Audio Odyssey argues the Bank's seizure of collateral held by a superior security interest was commercially unreasonable. However, it is not Audio Odyssey's claim to make; rather, that claim belongs to the holder of the superior security interest.

For the above stated reasons, the Bank's motion for summary judgment on the U.C.C. commercial reasonableness claim must be granted.

### 5. U.C.C. General Obligation of Good Faith

Audio Odyssey argues the Bank breached its duty to act in good faith by seeking the replevin action based on untrue facts and by convincing the sheriff to seize the real estate. Audio Odyssey asserts the Bank's 1978 contract with the SBA required prior written permission to accelerate on Audio Odyssey's loan; failure to do this was a breach of the Bank's obligation to act in good faith. Audio Odyssey also argues there are fact issues for a jury regarding the Bank's conduct in the extended seizure.

The Bank argues the "good faith" provision urged by Audio Odyssey directs the Court to interpret the contract within the commercial context in which it was formed. See Iowa Code § 554.1203 (2001) ("Every contract or duty within this chapter imposes an obligation of good faith in its performance or enforcement."). Furthermore, the comment to § 554.1203 clearly states that nothing in the section creates a separate cause of action for failure to perform or enforce in good faith.

> This section does not support an independent cause of action for failure to perform or enforce in good faith. Rather, this section means that a failure to perform or enforce, in good faith, a specific duty or obligation under the contract, constitutes a breach of that contract or makes unavailable, under the particular circumstances, a remedial right or power.

Id. § 554.1203 cmt.

The Bank argues that as long as the creditor honestly believes it is insecure, enforcement of an acceleration clause is reasonable; it does not matter that the facts may ultimately show the creditor was wrong and payment was not impaired. See Jackson v. State Bank of Wapello, 488 N.W.2d 151, 156 (Iowa 1992) ("Simply put, the question is whether the creditor acted honestly, not whether the creditor acted reasonably. Put another way, as long as the creditor honestly believes the creditor is insecure, that is enough. Under this standard, then, it makes no difference that the facts ultimately establish the creditor was wrong and payment was not impaired.").

In applying this standard, the Bank argues there is no evidence a legal duty of good faith was violated: (1) the SA provided that Audio Odyssey was in default if it failed to make timely payments on the loan, maintain adequate insurance, or pay taxes; (2) the SA contained an acceleration clause which allowed the Bank to declare the principal balance due if it believed itself to be insecure; (3) in the week prior to the replevin action, the Bank received information that Audio Odyssey was at least $50,000 in arrears in taxes and the insurance company had issued a cancellation notice; (4) Audio Odyssey's loan installments had been untimely for the previous five months; (5) two days before the replevin, the Bank informed Audio Odyssey that in addition to remedying its tax problem and paying the loan installments, its business account overdrafts must be covered; (6) the day before the replevin, Audio Odyssey had only paid enough to cover the overdue loan installments; (7) the Bank knew Audio Odyssey planned a large sale, therefore, immediate action to protect the collateral was required; and (8) a replevin order was entered following a hearing before a neutral judicial officer.

The Court is not convinced Audio Odyssey has even stated a claim upon which relief may be granted, as there appears to be no separate cause of action for

breach of good faith under the U.C.C. This notwithstanding, the Bank was pursuing its rights under a valid SA, and the Eighth Circuit has already reasoned that the Bank constitutionally pursued the replevin action. The Bank's motion for summary judgment on the U.C.C. general obligation of good faith claim is granted.

### 6. Improper Action on the Replevin Bond

In its complaint, Audio Odyssey alleges it is entitled to the replevin bond because the damage caused by the sheriff's seizure exceeded the amount of the replevin bond. The Bank argues it is entitled to summary judgment on this claim because the purpose of the bond is to reimburse a party for injuries caused by the replevin proceeding. Since the Eighth Circuit determined the facts surrounding the replevin were consistent with the Iowa replevin statute, the replevin order was properly entered. Furthermore, the Eighth Circuit found the taking of Audio Odyssey's personal property and securing the premises to inventory the collateral was a lawful execution of the replevin order.

Audio Odyssey argues the Bank is not entitled to summary judgment on this claim because the Eighth Circuit did not find the entire replevin was lawful; in fact, it found the extended possession of the premises *was not lawful.* Audio Odyssey further denies that the Eighth Circuit recognizes the Bank's lease assignment argument.

The replevin bond restates the writ of replevin, listing the items subject to seizure. The bond also states:

Now, if said Brenton First National Bank, Plaintiff, shall prosecute this suit to effect, and without delay, and make return of said property, if return thereof shall be awarded, or will deliver the same to the intervening petitioners should it be found that the property belongs to them, and save and keep harmless the said sheriff in replevying the said property, and in delivering said property to said plaintiff by virtue of said writ, and pay all costs and damages occasioned by wrongfully suing out said writ of replevin, then this obligation to be void; otherwise to remain in full force and effect.

 The Eighth Circuit found the initial replevin action was constitutional; only the Bank's extended seizure of real property was unconstitutional. The replevin bond exclusively covered the collateral listed therein. The Bank had a right to that personal property and is not liable to Audio for seizure thereof. Audio Odyssey's claim on the replevin bond must fail.

For the above stated reasons, the motion for summary judgment on the replevin bond action must be granted.

### 7. Impairment of Collateral

The Bank argues impairment of collateral is an affirmative defense against an action to collect an amount due; since the Bank has not sought deficiency from Audio Odyssey for the balance of the loan, this claim is not properly raised.

Audio Odyssey makes the argument that the Bank's wrongful seizure of the collateral caused a significant reduction in the value of the collateral. Audio has not stated how this cause of action applies to this case or why it is entitled to relief thereunder.[21]

The Bank's motion for summary judgment on the impairment of collateral claim must be granted.

---

**21.** Iowa Code § 554.3606, which was an affirmative defense allowing for the discharge of the holder of a note due to the impairment of collateral, has been repealed. Iowa Code § 553.3606, *repealed by* Acts 1994 (75 G.A.) ch. 1167, § 121.

### 8. Abuse of Process

Audio Odyssey argues the Bank is not entitled to summary judgment on the abuse of process claim because it was clearly foreseeable that its action would bring it no gain but would result in the destruction of a million dollar business. Audio Odyssey urges the Court, for purposes of surviving summary judgment, there is enough evidence to infer that the Bank pursued the replevin not for the purpose of obtaining monetary gain, but for some other purpose.

■■■ The Bank argues this claim fails because Audio Odyssey must show the Bank used the legal process in an improper or unauthorized manner. *Tomash v. John Deere Indus. Equip. Co.*, 399 N.W.2d 387, 389 (Iowa 1997) ("In short, to succeed in [an abuse of process] claim two elements must be shown: (1) legal process; and (2) its use in an improper or unauthorized manner."). The Bank asserts it is undisputed that it pursued the replevin action for the purpose of gaining possession of the collateral, and there is no evidence to the contrary; therefore, this claim fails as a matter of law, and summary judgment is appropriate.

The Bank further asserts that for the same reasons this Court dismissed this same count against co-defendants Anderson & Nelson and Bernard Hofmann, it should likewise dismiss as to the Bank for lack of evidence. The Bank rejects Audio Odyssey's argument as irrelevant and immaterial that it was foreseeable to the Bank that it would receive little or nothing following the replevin action.

In resistance, Audio Odyssey makes conclusory arguments regarding the Bank's subjective intent but points to no evidence to support these allegations. The Eighth Circuit found the initial replevin action was properly pursued, foreclosing Audio Odyssey's claim of improper purpose. The Bank's motion for summary judgment on

the abuse of process claim must be granted.

### 9. Actual and Legal Malice—Punitive Damages

■■■ Audio Odyssey requests punitive damages based on malice. The Bank argues punitive damages are inappropriate in the present case and fail as a matter of law.

> An award of punitive damages is appropriate only when a party acts with actual or legal malice. Actual malice is shown by such things as personal spite, hatred, or ill will. Legal malice is established by showing wrongful conduct committed with a willful or reckless disregard for the rights of another.

*Parks v. City of Marshalltown*, 440 N.W.2d 377, 379 (Iowa 1989). More than mere negligence must be shown. *Barnhouse v. Hawkeye State Bank*, 406 N.W.2d 181, 184 (Iowa 1987).

Audio Odyssey argues the Bank's conduct illustrates punitive damages are appropriate because the Bank (1) obtained the writ of replevin without following the proper procedure for original notice; (2) represented to the court that Audio Odyssey was in default when Audio Odyssey had made a deposit less than twenty-four hours prior with specific instructions to apply it to the loan; (3) represented to the court the collateral was uninsured when it was not; (4) represented to the court timely financial statements were not being made when the Bank attested to Audio Odyssey's timely financial statements just six weeks earlier; (5) represented to the court that under the SA it was entitled to possess Audio Odyssey's personal property when it did not have the SBA's written permission; and (6) represented to the court that without immediate action, the Bank was endangered.

██ Under the terms of the SA, the Bank had the option of declaring Audio Odyssey in default based upon several events.

> Acceleration of Obligations and Default—Upon the occurrence of any of the following events, Bank may, at its option, with or without notice, declare the whole unpaid balance of any obligation secured by this Agreement, said events being as follows: (a) Debtor fails to make timely payments on any obligation secured hereby; (b) Debtor fails to observe any other covenant, promise or condition agreed to be by Debtor performed in any paragraph of this Agreement or any other note, obligation or agreement with the Bank; (c) Debtor or Debtor's agent gave or furnished to Bank a false statement, representation or warranty in a material respect; ...
> (f) Bank believes itself insecure.

Bank Defendants.' App. in Supp. of Mot. for Summ. J. (Security Agreement) at 82. Accordingly, Audio Odyssey was in default not only because of untimely loan payments, it was also behind on its taxes. Furthermore, the SA allowed the Bank to accelerate the loan if it believed itself to be insecure. The Bank was within its legal rights to pursue the replevin action and, therefore, was not acting with an improper or illegal purpose.

Likewise, Audio Odyssey has not presented any evidence the Bank initiated the replevin action out of spite, hatred, or ill-will. Although Audio Odyssey suggests the Bank's motivation was to put Audio Odyssey out of business, that claim is both an illogical posture for a commercial lender and is unsupported by the record. The Bank endeavored to work with Audio Odyssey to work out its financial difficulties by allowing Audio Odyssey to make interest only payments for several months, paying checks written on insufficient funds, and recommending Audio Odyssey for a line of credit.[22]

The evidence Audio Odyssey offers does not show the Bank acted with "spite, hatred, or ill will", nor has Audio Odyssey offered any evidence of "wrongful conduct committed with a willful or reckless disregard for the rights of another." *See Parks*, 440 N.W.2d at 379. *See, e.g., McClure v. Walgreen Co.*, 613 N.W.2d 225, 231 (Iowa 2000) (finding there was sufficient evidence to submit the charge of legal malice to the jury where there was evidence the defendant misfilled over thirty prescriptions and knew it had a serious problem in this regard); *Condon Auto Sales & Serv., Inc. v. Crick*, 604 N.W.2d 587, 594 (Iowa 1999) (finding there was sufficient evidence to support punitive damages where defendant wilfully and wantonly disregarded the rights of his employer by retaining funds he knew belonged to the employer). The conduct of the Bank, particularly when viewed in retrospect, could be characterized as more aggressive than precise. However, the Court does not find the conduct as illustrated by this record meets the legal threshold for punitive damages.

For the above stated reasons, Defendants' motion for summary judgment on the punitive damages claims must be granted.

## IV. AUDIO ODYSSEY'S MOTION FOR SUMMARY JUDGMENT

Audio Odyssey filed a motion for summary judgment against all defendants on all claims. In support of its motion, Audio

---

**22.** The Bank recommended the line of credit because Audio Odyssey told the Bank it needed to buy more merchandise, but Audio Odyssey intended to use the money to pay back taxes. This misrepresentation was also grounds for the Bank to declare Audio Odyssey in default.

does not present a single legal argument. Audio merely reaches factual conclusions of why it should prevail. These arguments are lacking evidentiary support and are largely inconsistent with the Court's conclusions on the competing motions.

Audio Odyssey's motion for summary judgment must be denied.

## CONCLUSION

For the reasons stated above, the Scott County Defendants' motion for summary judgment is **GRANTED**. The Law Firm Defendants' motion for summary judgment is **GRANTED**. The Bank's motion for summary judgment is **DENIED** as to the § 1983 claim and trespass claims, and **GRANTED** as to the remaining state law claims and on the issue of punitive damages. Audio Odyssey's motion for summary judgment is **DENIED**. The claims against John M. Norris, Charles A. Barton, Bernard J. Hofmann and Anderson & Nelson, and Merchants Bonding Company are **DISMISSED**.

**IT IS SO ORDERED.**