Karen USELDINGER, as personal representative of the Estate of William Conrad Useldinger, deceased, Appellant,

v.

OLD REPUBLIC LIFE INSURANCE COMPANY, Respondent.

No. C7-85-774.

Court of Appeals of Minnesota.

Nov. 19, 1985.

Review Denied Jan. 17, 1986.

Frank L. Racek, Fargo, N.D., for appellant.

Carol E. Harrang, Grand Forks, N.D., for respondent.

Heard, considered and decided by FOLEY, P.J., and FORSBERG and NIERENGARTEN, JJ.

## OPINION

FOLEY, Judge.

This is an appeal from an April 4, 1985 judgment granting respondent insurance company's motion for summary judgment based on Minn.Stat. § 61A.11 (1984). This statute allows an insurer to rescind a non-medical examination life insurance policy when an insured wilfully misrepresented his physical condition on the application for insurance. The trial court found that negative responses on the application pertaining to high blood pressure, enlarged glands and serious illness were wholly inconsistent with decedent's medical history. Appellant claims that a genuine issue of material fact exists concerning decedent's knowledge of his physical condition and the medical conclusions of examining physicians. We affirm.

## FACTS

On April 15, 1983, William Useldinger made written application for insurance with respondent Old Republic Life Insurance Company. The policy sought was worth $250,000, coverage for one year at a premium of $916.25.

The application contained a number of questions pertaining to Useldinger's health, the relevant excerpts which are as follows:

Have you ever been told you had any of the following:

1. * * * High Blood Pressure * * *? Answer: No.

* * * * * *

3. * * * Enlarged Glands * * *? Answer: No.

4. Any serious illness, disorder * * * other than those mentioned? Answer: No.

5. Have you any information or indication that you are NOT now in sound health? Answer: No.

Useldinger was further instructed to provide the name of a family physician and the date of his last medical examination. He listed Dr. William Powers as the physician of record but did not provide an examination date. A certificate of insurance was issued to Useldinger on April 18, 1983. Respondent did not contact Dr. Powers or require a medical examination prior to issuance of the certificate.

On May 16, 1983, Useldinger was admitted to a hospital and diagnosed as suffering from liver disease. He died on July 30, 1983. Cause of death was listed as liver and kidney failure due to cirrhosis of the liver, a result of chronic alcoholism.

A claim for life insurance benefits was then submitted to respondent on behalf of the estate of Useldinger. During investigation of the claim, respondent discovered that Dr. Casey Ryan, a board certified internist, had diagnosed Useldinger as suffering from high blood pressure and cirrhosis of the liver in October 1981. By deposition, Dr. Ryan detailed the results of four examinations with Useldinger from October 8, 1981 to April 16, 1982. A synopsis of that testimony follows.

October 8, 1981: Useldinger complained of numbness in his lower legs and problems with his equilibrium. Following a complete physical examination, Dr. Ryan diagnosed Useldinger as having an enlarged liver, probably due to alcoholic liver disease, and high blood pressure. Further diagnosis included cigarette abuse and cer-

ebellar dysfunction. Treatment for the conditions was discussed:

On that day, he was advised to discontinue all alcohol. He was advised to start on a vitamin, a multi-vitamin. In addition, he was advised to see me on a later date for re-check of his blood pressure and to review the blood studies which have been performed.

Q. Did you advise him on that day, of your * * * impressions or findings?

A. Yes.

Q. In your impression, did he appear to understand your diagnoses of the state of his health?

A. Yes.

Dr. Ryan subsequently admitted using the terms "hypertension" and "HBP" rather than high blood pressure when explaining the condition to Useldinger.

October 13, 1981: Useldinger's blood pressure was rechecked and remained elevated. He was advised to start a low salt diet. Dr. Ryan also found evidence of serious liver dysfunction and scheduled a liver scan the same day. The scan revealed an enlarged spleen and abnormalities in Useldinger's bone marrow, indicating liver disease.

October 29, 1981: Results of the liver scan were discussed with Useldinger:

A. * * * I discussed with him the fact that he had cirrhosis and we discussed the long-term treatment.

Q. What was that long-term treatment?

A. To avoid alcohol. * * * I did suggest to him that he consider going into an alcohol treatment program.

Q. Did he appear to be understanding your recommendations with regard to his liver problem and his drinking problem?

A. Yes.

Useldinger's blood pressure was again rechecked and had increased since the October 13th visit. Dr. Ryan prescribed blood pressure medication and advised Useldinger to see him in one week.

Q. In your estimation, was he aware that the medication given to him was to control his high blood pressure?

A. Yes.

April 16, 1982: Dr. Ryan concluded that Useldinger's liver had enlarged from his previous examination on October 29, 1981. He also noted an elevation in Useldinger's blood pressure and increased his medication.

Q. Did you advise Mr. Useldinger of your finding with regard to the size of the liver?

A. Yes.

Q. Did he appear to understand what you were telling him?

A. Yes, he did. Again, on that date, I wrote down two diagnoses; hypertension and cirrhosis. I advised that he should go into the alcohol unit. He told me that he wanted to try it on his own.

*     *     *     *     *     *

A. * * * his blood pressure was elevated. I increased his hydrochlorothiazide to 100 milligrams a day, or two tablets. We also ordered some repeat liver studies and I told him I wanted to see him in two week's time.

Tests run in April 1982 indicated ongoing alcoholic hepatitis. In answer to respondent's interrogatories, appellant admitted that Useldinger had unsuccessfully attempted alcohol treatment on two occasions, in March 1978 and sometime during June 1983.

On May 16, 1983, Useldinger was again examined by Dr. Powers, the family physician, who made an immediate diagnosis of cirrhosis. He was hospitalized the same day and later examined by Dr. Ross Ronish, a family practitioner.

On February 27, 1985, respondent moved for summary judgment. Appellant's response to the motion consisted of affidavits vouching for Useldinger's good character and a letter from Dr. Powers stating that he found no abnormalities when checking Useldinger for an elbow condition on March 11, 1983.

Oral arguments were scheduled for March 18, 1985. Appellant informed the court that a transcript of Dr. Ronish's deposition would not be available until March

28, 1985. The deposition asserted that layman do not normally associate hypertension with high blood pressure and further that some patients do not view cirrhosis as a serious disease.

On March 30, 1985, the trial court granted respondent's motion. In its memorandum, the court relied heavily on Dr. Ryan's deposition and disregarded the summarized testimony of Dr. Ronish.

## ISSUE

Did the trial court err in granting respondent's motion for summary judgment?

## ANALYSIS

Under the Minnesota Rules of Civil Procedure, summary judgment is properly granted when:

> [T]he pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that either party is entitled to a judgment as a matter of law.

Minn.R.Civ.P. 56.03; *see Grondahl v. Bulluck*, 318 N.W.2d 240, 242 (Minn.1982). In making this determination, a trial court must view the evidence in a light most favorable to the non-moving party. *Ostendorf v. Kenyon*, 347 N.W.2d 834, 836 (Minn.Ct.App.1984). On appeal from an entry of summary judgment, the sole question before a reviewing court is whether an issue of established material fact exists. *Campion v. Wright County*, 347 N.W.2d 289, 291 (Minn.Ct.App.1984).

▇ The proper framework for this case is provided by Minn.Stat. § 61A.11 (1984), which states in part: .

> In any claim upon a policy issued in this state without previous medical examination, or without the knowledge or consent of the insured, * * * the statements made in the application as to the age, physical condition, and family history of the insured shall be valid and binding upon the company, *unless wilfully false*

> *or intentionally misleading.* (Emphasis supplied)

Underlying this statutory provision is the well-founded standard that the insurer has the burden of proving misrepresentation on an insurance application. *Price v. Standard Life & Accident Insurance Co.*, 90 Minn. 264, 95 N.W. 1118 (1903).

Appellant argues that a genuine issue of material fact exists as to decedent's wilfull misrepresentation of health on the insurance application. She claims that the medical conclusions are conflicting and that affidavits submitted on her behalf create a jury question as to decedent's knowledge of his physical condition. We disagree. The trial court properly relied on *Howard v. Aid Association for Lutherans*, 272 N.W.2d 910 (Minn.1978), and *First Trust Co. of St. Paul v. Kansas City Life Insurance Co.*, 79 F.2d 48 (8th Cir.1935), in deciding the summary judgment issue. Both cases addressed wilful misrepresentation in an application for life insurance.

In *Howard*, the decedent had contracted for life insurance containing a double indemnity clause. During investigation into the cause of death, an accidental shooting, the insurance company discovered that the decedent had a history of chemical dependency and sporadic treatment for the condition. The investigation further disclosed dependency treatment on two occasions prior to his application for insurance and an unfavorable prognosis for recovery. Relying on the rescission standard in section 61A.11, the court held that the decedent had wilfully misrepresented his physical condition and that had the insurer known, it would not have issued the life insurance policy. Summary judgment issued in favor of the insurance company was thus affirmed:

> [T]he question should not be whether or not the applicant was afflicted with a particular disease, *but whether at the time of application "facts of which the insured had full knowledge were concealed from the insurer * * * and were of such probative force as in all reasonable probability, if brought to the knowl-*

edge of the company, would have precluded the issuance of the policy."

*Howard,* 272 N.W.2d at 913 (quoting *Metropolitan Life Insurance v. Samis,* 172 Md. 517, 528, 192 A. 335, 339 (1937)) (emphasis supplied).

In *First Trust,* the court, applying Minnesota law, held that an applicant's failure to disclose his diabetic condition on the application for insurance constituted wilfull misrepresentation.

> Whether an insurer will enter such a contract with a particular person depends upon a situation which must appear satisfactory to the insurer.  * * * The application is one of the customary methods of acquiring desirable information from the insured himself in respect to matters deemed important by the insurer and concerning which the insured would have knowledge.

*Id.* at 51.  A wilfully false and intentionally misleading statement has also been defined as "one which is consciously made with a premeditated design so to falsify the facts as to lead the insurer to act when he otherwise would not." *Siemers v. United Benefit Life Insurance Co.,* 246 Minn. 459, 462, 75 N.W.2d 605, 608 (1956).

Appellant contends that *Howard* is distinguishable from the present case because the application in that case specifically required information pertaining to drug abuse.  She asserts that the decedent here did not similarly misrepresent his alcohol problem because the application never required this information.  This argument is misplaced.  Even if the application here did not specifically require disclosure of an alcohol problem, it *did* require disclosure of a "serious illness [or] disorder."  We think chronic alcoholism that results in cirrhosis of the liver falls within this category.

As the trial court noted, Dr. Ryan consistently warned decedent to discontinue alcohol.  He strongly counseled decedent to receive treatment for alcoholism.  Decedent chose to ignore these recommendations and proceed on his own despite a track record of unsuccessful treatment in 1978.  The result of decedent's ongoing battle with alcohol was cirrhosis of the liver, a progressive and often deadly disease if, as here, steps are not taken to prevent further liver deterioration.  Plainly, this condition cannot be classified as trivial or temporary.  *See Dahlke v. Metropolitan Life Insurance Co.,* 218 Minn. 181, 187, 15 N.W.2d 524, 527 (1944).

Moreover, an improper diagnosis by a prior physician or an underestimation of dangers by a patient does not operate to transform a serious disease into a minor ailment.  *Lawien v. Metropolitan Life Insurance Co.,* 211 Minn. 211, 216, 300 N.W. 823, 826 (1941).  This is not to say that the casual connection between misstated facts and ultimate cause of death is controlling.  Clearly, under *Howard,* it is not.  The materiality of a misrepresentation or omission in this jurisdiction is measured "by the extent to which the disclosure influenced the insurer's decision to initially assume the risk of coverage." *Howard,* 272 N.W.2d at 912.  We are convinced that these facts, if disclosed, would have substantially influenced respondent's decision to provide coverage.

Resolution of this case is further bolstered by the fact that respondent's application specifically asked for knowledge of high blood pressure.  We note that decedent's four visits with Dr. Ryan in 1981–82 each resulted in identification of a blood pressure problem.  Appellant claims that Dr. Ryan's use of the word "hypertension" instead of high blood pressure creates a factual issue concerning knowledge of the condition.

This claim is not persuasive.  The record before us discloses that a number of discussions took place between decedent and Dr. Ryan concerning treatment for this condition.  On October 7, 1981, the date of the original diagnosis, Dr. Ryan recommended a vitamin program.  On October 13, he advised decedent to reduce his salt intake.  On October 29, Dr. Ryan prescribed medication, and on April 16, 1982, he increased the dosage.  We think it is clear that decedent knew he had high blood

pressure even if he did not subjectively appreciate the seriousness of the condition.

The only evidence before us that arguably disputes decedent's knowledge of his condition is a letter from Dr. Powers stating that he found no abnormalities following a March 11, 1983 examination of decedent for an elbow condition. Without details of what the examination entailed, we cannot say that the finding created an issue of material fact.

■ Appellant strongly urges us to incorporate Dr. Ronish's deposition. This we decline to do. The trial court properly disregarded this deposition. Dr. Ronish did not examine decedent until May 16, 1983, more than a month after the application for insurance was completed. His findings are thus irrelevant to the basic issue in this case.

We recognize that generally an alleged misrepresentation on an insurance application is an issue for the jury. *See Roeder v. North American Life Insurance Co. of Chicago,* 259 Minn. 168, 106 N.W.2d 624 (1960); *Siemers v. United Benefit Life Insurance Co.,* 246 Minn. 459, 75 N.W.2d 605 (1956). The present facts, however, are analogous with those in *First Trust* and thus present a question of law. *First Trust,* 79 F.2d at 54. We find no error here and affirm the trial court's entry of summary judgment for respondent.

## DECISION

Summary judgment for the insurance company was proper when the decedent failed to disclose serious health problems originally diagnosed 18 months prior to the application for insurance.

Affirmed.

NIERENGARTEN, Judge, dissenting:

I respectfully dissent. The trial court erred in summarily finding that the decedent willfully misrepresented his medical history on an application for life insurance where factual questions exist as to whether the decedent had full knowledge of his

physical condition when the insurance form was completed.

In *Howard v. Aid Association for Lutherans,* 272 N.W.2d 910 (Minn.1978) the supreme court cited with approval the standard used to determine whether an insured has willfully misrepresented his physical condition on a life insurance application. Crucial to the standard is the requirement that an insured have full knowledge of his condition at the time of the application. The *Howard* court stated:

> [T]he question should not be whether or not the applicant was afflicted with a particular disease, *but whether at the time of application "facts of which the insured had full knowledge were concealed from the insurer * * *" and were* of such probative force as in all reasonable probability, if brought to the knowledge of the company, would have precluded the issuance of the policy."

*Howard,* 272 N.W.2d at 913 (quoting *Metropolitan Life Insurance v. Samis,* 172 Md. 517, 192 A. 335 (1937)) (emphasis supplied).

The decedent-insured gave negative responses to two questions included in the application for life insurance: (1) Have you ever been told you have high blood pressure?; and (2) Have you ever had any serious illness or disorder? The information possessed by Useldinger at the time he completed the application creates genuine fact issues as to whether his denials intentionally concealed facts which, if known to the insurer, would have precluded the issuance of the policy.

A material fact issue arises concerning whether Useldinger had full knowledge of his high blood pressure. The majority notes in its opinion that each of decedent's four visitations with Dr. Ryan in 1981–82 resulted in identification of a blood pressure problem. Although diagnosed as having high blood pressure Dr. Ryan never used the term when explaining the condition to Useldinger. Instead he chose to advise Useldinger that he had hypertension, a term which many patients would not

readily associate with high blood pressure.[1] Nor, as the majority reasons, would treatment of his condition necessarily alert Useldinger to the fact he had high blood pressure. Dr. Ryan himself admitted at his deposition that regulation of salt intake does not always indicate a high blood pressure problem.

A material fact issue also arises concerning whether Useldinger had full knowledge that his alcoholism and related problems constituted a serious illness or disorder. The majority relies solely on the deposition testimony of Dr. Ryan who stated he consistently warned Useldinger to discontinue use of alcohol. At no time, however, did Dr. Ryan advise Useldinger of the seriousness of his condition or the ultimate consequences to his health if he did not do so. In fact, at Dr. Ryan's examination of Useldinger on October 29, 1981 he suggested a "long-term" treatment program to deal with his condition. Useldinger could well have concluded, given this advice, that his illness was not serious in nature if treatment were possible over a long period of time.

I would reverse the trial court's grant of summary judgment in favor of the insurer. Factual issues exist as to whether the insured willfully misrepresented his physical condition to the insurer when he completed his application.

---

1. The trial court ruled and the majority agreed that the deposition testimony of Dr. Ronish who examined Useldinger one month after the life insurance application was completed was irrelevant since his findings had no bearing on whether Useldinger wilfully misrepresented his physical condition to respondent. Although the results of his examination may be irrelevant, Dr. Ronish's observations concerning a layman's understanding of the correlation between high blood pressure and hypertension is certainly relevant to the issue of Useldinger's alleged misrepresentation. I would allow the deposition of Dr. Ronish for this limited purpose.