**Peggy A. LeBUS, Plaintiff–Appellant,**

v.

**NORTHWESTERN MUTUAL LIFE INSURANCE COMPANY, Defendant–Appellee.**

No. 94–2668.

United States Court of Appeals, Eighth Circuit.

Submitted Feb. 13, 1995.

Decided June 9, 1995.

Daniel W. Schermer, Minneapolis, MN, argued, for appellant.

Bridget M. Ahmann, Minneapolis, MN, argued, for appellee.

Before BOWMAN, BEAM and HANSEN, Circuit Judges.

HANSEN, Circuit Judge.

Peggy A. LeBus appeals the district court's grant of summary judgment in favor of Northwestern Mutual Life Insurance Company (Northwestern) in this action to recover death benefits on a life insurance policy that Northwestern issued to Peggy LeBus's now deceased husband, L. Martin LeBus. The district court concluded that because the undisputed facts disclose that Martin intentionally misled Northwestern concerning material health-related facts, Northwestern was entitled to deny Peggy's claim on the policy. We affirm in part and reverse in part.

## I.

The following facts are undisputed. Peggy LeBus's husband, L. Martin LeBus, originally applied for and obtained a life insurance policy from Northwestern in 1986, naming Peggy as the beneficiary. Over the years, Martin allowed the policy coverage to lapse several times due to delinquent premium payments. Each time, Martin would request reinstatement of the policy when he had the money available to pay the premiums. The most recent lapse of coverage occurred on October 13, 1991, due to Martin's nonpayment of the August 6, 1991, premium. Martin tendered payment and completed a request for reinstatement form on October 21, 1991.

Northwestern's reinstatement request form requires the insured to make a statement of health, declaring that since the policy lapsed, the insured has not "consulted, been treated or advised to be treated by a physician or health practitioner for sickness, disease, injury or other reason." (Jt. App. at A–15.) The insured is instructed to give specific dates and details if any exceptions to this declaration exist. On Martin's October 21, 1991, request for reinstatement, he declared that he had not "consulted, been treated or advised to be treated by a physician" during the lapse in coverage beginning August 6, 1991. In the space provided to list exceptions to the declaration, Martin noted that he had seen Dr. LaFond for a cold. Martin provided no dates and no further details.

Dr. LaFond's deposition testimony and Martin's medical records reveal that during the policy lapse, Martin consulted Dr. LaFond for what he originally thought was a cold, but the focus of the consultation and treatment quickly changed from treatment of a cold to diagnosing an abnormal mass found in Martin's lung. Martin, a heavy smoker with a long history of lung and upper respi-

ratory difficulties (disclosed to Northwestern in his initial policy application), visited Dr. LaFond on September 25, 1991, complaining of persistent cold symptoms. Dr. LaFond diagnosed an upper respiratory infection for which he prescribed antibiotics. Martin returned on October 15, 1991, because the infection did not respond to the antibiotics. Dr. LaFond then diagnosed bronchitis with "possible pneumonia," (Jt.App. at A–33) and changed the antibiotics prescription. Dr. La-Fond also took chest X rays, which he showed to Martin that day. The X rays revealed an "abnormality" which, in Dr. La-Fond's opinion, needed a closer look "to see if this was clearly just a pneumonia or if there was something more serious going on." (*Id.* at A–41, –42.)

Dr. LaFond scheduled Martin for a CT scan on October 18, 1991. The CT scan showed "a significant abnormality highly suggestive of cancer." (*Id.* at A–43.) Because of this finding, Dr. LaFond scheduled a bronchoscopy, which is in essence a lung tissue biopsy, for October 21, 1991, which was the day that Martin signed the request for reinstatement form. Dr. LaFond informed Martin of the risks and reasons for these various procedures. Dr. LaFond made a definitive diagnosis of lung cancer after the bronchoscopy on October 21, 1991. Whether or not Dr. LaFond communicated the definitive cancer diagnosis to Martin on the same day or sometime later is in dispute, but it is not material to our resolution of this case.

Peggy LeBus testified by affidavit that she urged Martin to see Dr. LaFond because of a persistent cold. She said that Martin's demeanor, behavior, and personality (always an optimist) were unchanged while he was going through the tests on October 18 and 21, and that Martin told her that Dr. LaFond would not speculate on what might be wrong until he got the results of the tests. She further testified that Martin was extremely distraught when he called her from his office on October 25, 1991, to tell her that he had just learned of the cancer diagnosis. She maintains that Martin did not know he had cancer until October 25, 1991, so he did not intentionally mislead Northwestern on the request for reinstatement form.

On May 14, 1993, Martin LeBus died of lung cancer. After Martin's death, Peggy sought to recover $100,000 in death benefits on the life insurance policy that Northwestern had issued to her husband. Northwestern refused to pay benefits on the policy, asserting that Martin had misrepresented his health condition in his most recent application for policy reinstatement, dated October 21, 1991.

Peggy brought this diversity of citizenship suit against Northwestern, seeking to recover the proceeds allegedly due under the life insurance policy. Based upon the undisputed facts, the district court granted Northwestern summary judgment, concluding that Martin had made material misrepresentations in his request for reinstatement form— not because he had knowledge of a cancer diagnosis but because he failed to disclose the facts he knew regarding the abnormal lung mass and the diagnostic testing. Peggy appeals, arguing that the district court improperly resolved disputed facts on a motion for summary judgment. She also contends that she is entitled to the paid-up value of the policy.

## II.

■ We review a grant of summary judgment de novo, applying the same standard as the district court. *RSBI Aerospace, Inc. v. Affiliated FM Ins. Co.,* 49 F.3d 399, 401 (8th Cir.1995). Summary judgment is proper when, construing all evidence in favor of the nonmoving party, there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. *Id.;* Fed. R.Civ.P. 56(c). *See also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986). When a motion for summary judgment is made and properly supported, the nonmoving party may not rely on bare allegations but must set forth specific facts showing that there is a genuine issue for trial. *See Marshall v. UNUM Life Ins. Co.,* 13 F.3d 282, 284 (8th Cir.1994).

■ The first issue in this case is whether Martin LeBus made intentional misrepresentations on the request for policy reinstate-

ment form dated October 21, 1991, within the meaning of Minnesota law, which the parties agree applies to this case. The request for reinstatement form specifically provided that "on the basis of a misstatement in this Request or application, [Northwestern] may rescind the insurance or deny a claim." (*Id.* at A–16.) Minnesota law allows an insurance company to void an insurance contract if the policy was issued on the basis of statements about the insured's medical condition that were wilfully false or intentionally misleading, as those terms are used in Minn.Stat. § 61A.11. *See Ellis v. The Great-West Life Assurance Co.,* 43 F.3d 382, 386 (8th Cir. 1994). Minn.Stat. § 61A.11 provides in pertinent part as follows:

> In any claim upon a policy issued in this state without a previous medical examination ..., the statements made in the application as to the age, physical condition, and family history of the insured shall be valid and binding upon the company, unless wilfully false or intentionally misleading.

Minnesota courts have held that "a willfully false and intentionally misleading answer is one which is consciously made with a premeditated design so as to falsify facts so as to lead the insurer to act when he otherwise would not" and that "[w]ilfully false denotes knowingly concealed." *Siemers v. United Benefit Life Ins. Co.,* 246 Minn. 459, 75 N.W.2d 605, 608 (1956). We have observed, however, that the Minnesota courts do not always require proof of a subjective "premeditated design." *Ellis,* 43 F.3d at 386–87 (discussing *Howard v. Aid Ass'n for Lutherans,* 272 N.W.2d 910 (Minn.1978); *St. Cloud Nat'l Bank & Trust Co. v. Woodmen of the World Life Ins. Soc'y,* 451 N.W.2d 75 (Minn. Ct.App.1990); *Berthiaume v. Minnesota Mutual Life Ins. Co.,* 388 N.W.2d 15 (Minn. Ct.Ap.1986); *Useldinger v. Old Republic Life Ins. Co.,* 377 N.W.2d 32 (Minn.Ct.App.1985)). "[A]lthough a statement by an insured would be wilfully false or intentionally misleading if an insured acted with an intent to deceive the insurer, the phrase 'wilfully false or intentionally misleading' as used in Minn.Stat. 61A.11 does not require that there be an intent to deceive." *Ellis,* 43 F.3d at 387.

Whether it is necessary to demonstrate a subjective intent to deceive depends greatly upon the specificity and nature of the questions asked in the insurance application. When an insurance application requests disclosure of specific information, wilfulness depends on (1) whether the insured had full knowledge of the facts that were concealed when completing the application and (2) whether "the concealed facts probably would have precluded issuance of the policy if known to the insurance company." *Ellis,* 43 F.3d at 387.

After reviewing the record in this case, we are satisfied that the district court correctly granted summary judgment in favor of Northwestern on this issue. The undisputed facts disclose that Martin concealed relevant facts of which he was fully aware. The reinstatement request form required disclosure not only of medical treatment but also of whether the insured had "consulted" with a physician for any reason. (Jt.App. at A–15.) Martin signed the statement of health on the request for reinstatement form, noting only that he had seen Dr. LaFond for a cold during the period from August 6, 1991, through October 21, 1991. Martin at the very least knew that he was currently consulting with Dr. LaFond about something potentially much more serious than a cold and that he was undergoing diagnostic tests to discover the cause of an abnormal mass found in his lung. Dr. LaFond first discovered the abnormal mass through the X rays taken on October 15, 1991. The mass was confirmed in a CT scan performed on October 18, 1991. Dr. LaFond then scheduled Martin for a bronchoscopy on October 21, 1991, the very day that Martin signed the reinstatement request form.

The only disputes of fact that Peggy raises are disputes as to Martin's subjective knowledge of his condition. She contends that Martin did not know that he had cancer until October 25, 1991, when he told her the diagnosis over the telephone and that he did not subjectively appreciate the seriousness of his condition at the time he completed the request for reinstatement form. However, these disputed facts, for the reasons previously mentioned, are not material to our

resolution of this case. This case turns not on Martin's subjective state of mind but on the objective facts of which Martin was aware yet failed to disclose in the request for reinstatement form. It is clear that Martin knew he was consulting Dr. LaFond and specialists concerning the abnormal mass in his lung. Even if Martin did not appreciate the seriousness of his condition and did not have a definitive diagnosis of cancer, the request for reinstatement form obligated him to reveal the consultations to give the insurance company an opportunity to assess their importance and his then-existing physical condition.

The insurance company, having asked on the request for reinstatement form whether the insured had consulted with a physician for any reason, was entitled to that information so that it could assess the significance of the facts. *See Ellis*, 43 F.3d at 388. In this case, the true facts present a much different picture than Martin's singular cryptic response of "Dr. LaFond—cold." Martin's actual consultations on October 18 and October 21, 1991, suggest a serious health condition. We conclude, as did the district court, that the facts concealed were of such probative force that Northwestern would not have reinstated the policy had it known all of the facts. Therefore, Martin's reinstatement attempt was void for misrepresentation, and Northwestern was not obligated to pay death benefits on the reinstated policy.

█ The second issue in this case is whether any paid-up value remained on the original policy which lapsed for failure to pay a premium in August 1991. The misrepresentation on the request for reinstatement form did not affect the validity of the original defaulted policy. There is no dispute that Martin originally obtained this life insurance policy in 1986 without fraud or misrepresentation and that he maintained the policy until his last payment default in August 1991. The policy is a whole life-adjustable life insurance policy that accumulates a cash value and which received annual dividends. Section seven of the policy encompasses the basic requirements of Minn.Stat. § 61A.24, known as the standard nonforfeiture law for life insurance. These provisions work to pre-vent forfeiture of a life insurance policy upon an insured's failure to pay a premium.

The district court concluded that no law supported Peggy's theory that she was entitled to the paid-up value of the policy, but the court did not expressly consider what effect the nonforfeiture provisions might have had on Martin's policy at the time of his last default, or what value (if any) might have remained at the time of his death by reason of these provisions. The district court noted in a footnote that "the parties disagree as to what the paid-up value of the policy would be if the Plaintiff were allowed to recover." (Appellant's Addend. at 10 n. 1.) On appeal, Peggy argues that the district court should have awarded her the paid-up value of the life insurance policy as of the date of the last default since the reinstatement attempt was void. At oral argument, Northwestern's attorney conceded that if any paid-up value remained on the policy, Peggy should be entitled to that amount. We find that material questions of fact and law remain to be resolved on this issue, not the least of which is whether Martin's borrowings against the policy's cash values left anything of value in it.

Because the original policy lapsed for failure to pay a premium, the district court should have determined the legal effect, if any, of section seven and Minnesota's nonforfeiture law, and because questions of material fact exist, the court erred by granting summary judgment on this issue. Whether any death benefit value remained in this policy at the time of Martin's death must be determined by reference to the terms of the policy, Minnesota's life insurance nonforfeiture law, and the particular facts of this case. Therefore, we remand to the district court for further proceedings on this issue.

### III.

We find no material dispute of fact concerning Martin's misrepresentation in the request for reinstatement form, and we affirm the district court's granting of summary judgment to Northwestern on that issue. However, because material disputes of fact and law exist concerning whether section seven of the policy and Minnesota's nonfor-

feiture law work to preserve any value in the original policy, we reverse and remand this issue to the district court for further proceedings consistent with this opinion.