UNITED STEEL WORKERS OF AMERICA, AFL–CIO, CLC, and United Steel–Workers of America Local 164L, Plaintiffs,

v.

**TITAN TIRE CORPORATION, Defendant.**

No. 4:03–CV–40052.

United States District Court, S.D. Iowa, Central Division.

Feb. 18, 2005.

Mark T. Hedberg, Hedberg Owens & Hedberg, Des Moines, IA, John G. Engberg, Mark W. Bay, Minneapolis, MN, for Plaintiff.

Gene R. Lasuer, Davis Brown Koehn Shors & Roberts PC, Des Moines, IA, for Defendant.

## ORDER ON MOTION FOR SUMMARY JUDGMENT

GRITZNER, District Judge.

Currently before the Court is a Motion for Summary Judgment brought by Plaintiffs United Steel Workers of America, AFL–CIO, CLC, and United Steel Workers of America, Local 164L ("the Union") to enforce an arbitration award against Defendant Titan Tire Corp. ("Titan Tire"). The Union is represented by Mark Bay from Minneapolis and Mark Hedberg from Des Moines; Titan Tire is represented by Gene La Suer. A telephonic hearing on the motion was held November 3, 2004. The matter is fully submitted and ready for disposition.

### FACTS

From the early 1980s until July 16, 1994, Pirelli Armstrong Tire Corporation ("Pirelli") operated three tire production facilities: Nashville, Tennessee; Hanford, California; and Des Moines, Iowa. The nonsupervisory employees of all three tire plants were covered by the United Rubber Cork, Linoleum and Plastic Workers of America ("United Rubber Workers") collective bargaining unit. The employees of each plant were represented by local affiliates. Des Moines employees were represented by local affiliate—Local 164 ("the Union"); [1] Nashville and Hanford employees were represented by local affiliates, Local 670 and Local 703, respectively.

In July 1994, Pirelli was engaged in joint bargaining with the three United Rubber

---

1. In July 1995, United Rubber Workers merged with the United Steel Workers of America, AFL–CIO ("USWA"). Local 164 became USWA, Local 164L. The two collective bargaining units are synonymous for purposes of the issues in this case and are referred to collectively herein as "the Union."

Workers local affiliates about terms of a new labor agreement that would take effect at the expiration of current labor agreement which, by its own terms, was set to expire July 15, 1994. No agreement was reached by July 15, 1994, and the three local affiliates went on strike. However, on July 21, 1994, the Union learned that Defendant Titan Tire had purchased the Des Moines facility from Pirelli on July 16, 1994. At the time Titan Tire purchased Pirelli's Des Moines plant, in addition to the labor agreement that expired on July 15, 1994, all three facilities were also party to another agreement entitled 1991 Agreement on Employee Benefit Programs ("1991 EBP Agreement"), which set forth pension and health insurance benefits for participating members of the three facilities. The relevant portions of the Pension Plan stated,

Section 5.01. Normal Retirement

An Employee retiring during the life of this Agreement who shall have attained his Normal Retirement Date [2] shall be entitled to a pension upon retirement as hereinafter provided.

Section 5.02. Early Retirement

(a) Early Retirement. An Employee who, while accumulating seniority with the Employer, shall have attained age fifty-five (55), but not Normal Retirement Age, and who shall have not less than ten (10) years of Credited Service, retiring during the life of this Agreement, shall be entitled to a pension upon retirement as hereinafter provided. No employee while receiving a disability pension shall be eligible for a pension pursuant to this Paragraph.

(b) Special Early Retirement. An Employee who, while accumulating seniority with the Employer, shall:

(1) have attained not less than sixty-two (62) years of age and not less than ten (10) years of Credited Service, or

(2) have completed thirty (30) years of Credited Service, shall be entitled to a pension upon retirement as hereinafter provided. No Employee while receiving a disability pension shall be eligible for a pension pursuant to this Paragraph.

Section 6.01. Normal Retirement Pension

The initial amount of Normal Retirement Income to be provided for each Participant shall be an annual income payable in equal monthly installments equal to 1/2 of 1% of the Compensation prior to the fifth anniversary date of the Participation multiplied by the number of full years of past service with the Company to said anniversary date, plus 1/2 of 1% of his said Compensation not in excess of three thousand dollars ($3,000) multiplied by the number of years from such anniversary date to his Normal Retirement Date, subject to the provisions of Section 6.02.

Section 6.04. Minimum Normal Pension

(a) The Minimum Normal Pension payable monthly to an Employee who retires on or after his Normal Retirement Date and pursuant to Section 5.01 of Article V shall be equal to the applicable rate set forth below, multiplied by the Employee's years of Credited Service, computed to completed months for a fractional part of

---

**2.** Normal Retirement Age is defined in the 1991 EBP Agreement as "the date on which the Employee reaches the later of age sixty-five (65) or the fifth (5th) anniversary of commencement of participation in the Plan." Normal Retirement Date is defined as "the end of the month in which the Employee attains his Normal Retirement Age."

a year, ending with his *actual retirement date:*

For Employees retiring on or after <u>July 31, 1991</u> — Pension Amount <u>$30.00</u>

Section 6.05. Early Retirement Pension and Plant Closure

(a) Early Retirement Pension. An Employee who is eligible for a pension pursuant to Section 5.02(a) of Article V, but is not eligible for a pension under Section 5.02(b), shall be entitled, upon retirement, to receive a monthly pension the amount of which shall, at the Employee's election, consist of either:

(1) A deferred monthly pension determined in accordance with the provisions of Section 6.01 or 6.04 of this Article VI, but based on his Credited Service to the date of his early retirement, or

(2) An immediate monthly pension determined in accordance with the provisions of Section 6.01 or 6.04 of this Article VI, but based on his Credited Service to the date of his early retirement, such pension to be reduced by 4/10ths of 1% for each complete calendar month by which the date of such Employee's early retirement precedes the first day of the month next following the month in which his 62nd birthday will occur.

Section 24.04. Termination Date of Agreement.

Termination Date of Agreement. This Agreement shall continue in effect through 11:00 a.m. Friday, July 15, 1994. Thereafter, it shall renew itself for yearly periods unless written notice is given by either party to the other not less than sixty (60) days, but not more than seventy-five (75) days prior to the expiration date or any extension thereof, that it is desired to terminate given, the parties shall begin negotiations within the thirty (30) day period prior to the termination date, unless otherwise mutually agreed to. *If negotiations are not completed prior to the termination date, this Agreement, together with the Uniform Agreement, shall terminate unless extended by mutual agreement. Upon termination, this agreement shall terminate in all respects, except that the benefits provided by it shall be extended for ninety (90) days following such termination.* Except as herein otherwise provided, no provision of this Agreement shall be subject to change prior to the expiration date of this Agreement.

The plant workers were on strike when Titan acquired Pirelli's Des Moines plant on July 16, 1994. Consequently, Titan and the Union entered into negotiations in an attempt to resume plant operations. They were able to negotiate a "return-to-work" agreement, and production resumed. Pirelli continued to pay the costs of providing the health insurance and pension benefits established by the 1991 EBP Agreement until October 15, 1994—ninety days after the strike began.

## A. Collective Bargaining Negotiations

On August 4, 1994, the Union and Titan began negotiations for a new labor agreement. Present during the negotiations for Titan were Douglas Olson, attorney and chief negotiator; Russell Ash, Assistant to the Chairman; and Morey Taylor, Titan's CEO. Present for the Union were Earl Seymour, President of the Union, and John A. Peno, Vice President of the Union.

During negotiations, the Union took the position that pension benefits provided under the 1991 EBP Agreement should be continued; Titan rejected continuation of the Pension Plan, stating "we don't believe in pensions." Titan offered instead to im-

plement a 401K plan. On the issue of health insurance coverage, the Union sought to continue the health insurance benefits provided under the 1991 EBP Agreement; Titan took the position that it would continue for active employees but "not to the same extent," while coverage for retirees should be eliminated. Negotiations were not completed by October 15, 1994, when the 1991 EBP Agreement and the employees' health insurance coverage expired.

The parties agreed to implement new health insurance under both an HMO and a PPO plan. Pertinent to this discussion, the PPO plan carried a 10% co-payment, and Titan paid the premiums; employees contributed $45 per month for an individual plan and $90 per month for a family plan. The PPO plan went into effect on October 16, 1994.

Collective bargaining continued throughout the Fall of 1994 and into January 1995. During those negotiations, Taylor proposed that Titan would "freeze" rather than terminate the Pension Plan that had been available under the 1991 EBP Agreement. Under this provision, an employee would be credited for the years of service under Pirelli but would not be credited for service after Titan took over.

On January 14, 1995, Titan served notice on the Union that it would implement its "last, best and final offer" the next day. That offer contained the following provisions:

24.1.A The company will establish a co-pay Group Medical Insurance Program after the employee has successfully completed their probationary period, in accordance with the provisions of the policy for all employees and their eligible dependents covered by this Agreement who are eligible and who meet the at-work or insurable requirements of the insurance policy. Employee to pay:

Family $60/month, single $30/month, special circumstances and considerations could cause employees to pay more. A special PPO could be provided at the following co-pay rate: $90 Family, $45 Single. Annual open enrollment will be provided.

24.2.C Pension

1. The Current Pirelli Pension Plan shall be frozen (not terminated).

   a. The current Pension benefits will be vested and employees may retire under the terms and conditions of the plan.

   b. Future contributions will cease except as may actuarially be required.

   c. Employees will not accumulate additional years of service credit.

   d. Employees who retire will receive both the Pension Plan benefit less additional years of service credit and the proceeds of the 401K with both the employer's contribution and the employee's contribution.

   e. (See *Schedule D 9* URW 164 EBA, Article 1 thru 8, Part 1) for details of the Plan. [The parties agree that this is a reference to the fist eight sections of the 1991 EBP Agreement.]

On April 20, 1995, the Union and Titan executed a new labor agreement covering the three year period from April 17, 1995, through April 30, 1998 ("1995 CBA"). With the exception of "1991" being substituted for "Schedule D", Section 24.2.C appeared the same in the 1995 CBA as it appeared in the "last, best and final offer". The health care provision, Section 24.1.A in the 1995 CBA, was identical to the provision in the "last, best and final offer".

On December 8, 1995, a dispute arose between the Union and Titan over the implementation of the Pension Plan provision. The parties disagreed which date

was the "freeze" date of the plan. The Union maintained it was January 15, 1995, the date of the "last, best and final offer"; whereas, Titan argued it was October 15, 1994, the date the 1991 EBP Agreement expired.

Next, the Union argued the multiplier used for determining the pension should *increase with the employee's advancing age*, even though the years of credited service remained fixed. Titan argued the pensions would be determined as "deferred vested pensions," and employees *would not receive an increasing multiplier* with advancing age. Following the December 8, 1995, dispute, the Union brought a grievance challenging Titan's interpretation of Section 24.2.C of the 1995 CBA.

The health insurance coverage continued without change until January 1997. At that time, Titan notified employees that the percentage co-payment under the PPO plan would change as of March 1, 1997, from 10% to 20%. The Union brought a grievance on behalf of all affected employees challenging Titan's change in the co-payment.

Both the pension and health insurance disputes were before Arbitrator Thomas Gallagher (the "Arbitrator"). On May 15, 2002, he rendered a decision on both issues.

## B. Arbitrator's Award—Pension Plan

### 1. Freeze Date

The Arbitrator determined that although the language of 24.2.C did not expressly state the date when credited service would be frozen, the bargaining history showed that the parties understood the freeze date would be October 15, 1994. The Arbitrator reasoned that both parties knew that was the date Pirelli's contributions would end.[3]

### 2. Calculation of Credited Service— Multiplier

On the issue of how credited service should be calculated, the Arbitrator found

---

**3.** Joyce Kain, Titan's Human Resources Manager, appeared before the Arbitrator. She testified that Pirelli continued to administer the Pension Plan until fall 1996. She testified, however, that during that period she would just forward Pirelli the application for pensions she received, and Pirelli would calculate the pension to be paid.

In September 1994, Kain received the following memo from the Pirelli Retirement Plan committee:

This is to advise you that benefit accruals under the Pirelli Armstrong Tire Corporation Retirement Plan have been frozen as of October 15, 1994. This means that no service for determining benefits under the Plan will be credited after October 15, 1994. This action has no impact on participants who are receiving retirement benefits. Those benefits will continue to be paid. This notice does not affect employees of Titan Tire Corporation who formerly were employees of Pirelli Armstrong Tire Corporation.

Kain testified that after receiving the notice, she called Pirelli asking for clarification. Pirelli's attorney indicated that the last sentence, "This notice does not affect employees of Titan Tire Corporation who formerly were employees of Pirelli Armstrong Tire Corporation," meant that Titan would determine the employees' right to benefits.

Kain further testified that in early 1995, five grievances were filed because Pirelli used October 15, 1994, as the freeze date. To resolve the grievance, Kain used the January 15, 1995, date as the last date of credited service. She testified that she "got into a lot of trouble for that."

In determining October 15, 1994, was the freeze date, the Arbitrator found the fact that Kain resolved five disputes using January 15, 1995, did not establish an over-riding practice that disrupted the intent of the parties. The Arbitrator further reasoned that Kain was not a member of Titan's bargaining team and would not have been aware of the discussions about October 15, 1994, being the last date of credited service.

the language of Section 24.2.C was ambiguous as to whether the dollar amount multiplier would or would not advance with age. The Arbitrator pointed out that during the collective bargaining, Taylor had presented the position that the existing Pension Plan should be frozen rather than eliminated, a position Olson and Ash also presented. The Arbitrator considered the testimonies of Seymour, Ash, and Peno, as they each recounted Taylor's position on how the pension "freeze" would work.

Seymour testified that during the collective bargaining negotiations, Taylor told the Union representative that the first eight sections of the 1991 EBP Agreement would remain in force except that in the calculation of pension benefits, employees would not receive credited service for future employment.

Ash testified that in answer to a question posed by Seymour, Taylor responded, "you will get your years of service with Pirelli Armstrong, and then there will be no more years of service credit to get; it's stopped, but when you retire, those years of credit from Pirelli Armstrong, not Titan, will be yours."

Peno testified that during the negotiations, Taylor gave the following example of how this freeze would work: "If an employee with twenty-five years of frozen credited service retired after five more years of uncredited service, he would receive a pension calculated by multiplying the twenty-five years of credited service times $30 ...." The Arbitrator found this was consistent with Peno's other testimony regarding a conversation he had with Taylor in February of 2001 in which Taylor gave an example of what the employer was obligated to pay, conceding that the dollar multiplier was not frozen. The Arbitrator found Peno's testimony was determinative and awarded as follows:

Section 24.2.C of the 1995–98 labor agreement means that pensions are to be calculated with credited service frozen as of October 15, 1994. In addition, Section 24.2.C of the labor agreement means that the provision of the 1991 EBP Agreement remain effective insofar as they provide 1) a pension upon early retirement, 2) a disability pension and 3) a pension calculated by the use of a dollar multiplier that advances with age.

This interpretation is an interpretation of the 1995–98 labor agreement, and, accordingly, *I direct the Employer to calculate and pay pensions in accord with this interpretation for pension claims arising during the term of the 1995–98 labor agreement.*

The Arbitrator's Award did not state whether *all* pension and disability plans during the term of the 1995–1998 labor agreement should be recalculated or only the plans of certain individuals.

## C. Arbitrator's Award—Change to Employee's PPO Co–Payment

The Arbitrator found Olson's testimony summarized the parties' positions with respect to the PPO co-payment increase. Arguing for Titan, Olson said that Titan intended to leave the language flexible; accordingly, Section 24.1.A made no express guarantee of a particular level of benefits that must continue for the life of the agreement. However, Olson conceded that even under his read of Section 24.1.A, the employer would not be free to make substantial changes in the coverage provided.

The Arbitrator found that the increase doubled the employee's co-payment and amounted to a substantial change in coverage and awarded as follows:

The grievance is sustained. The Employer shall reimburse any employee

who was actually required to pay more than the 10% co-payment established in the original PPO coverage. The amount of that reimbursement shall be limited to the difference between what would have been required under the original 10% co-payment and what was required under the 20% co-payment established from March 1, 1997, through the expiration of the 1995–98 labor agreement.

The Arbitrator's Award was silent on how any overpayments were to be determined. The Arbitrator entered the Arbitration Award on May 15, 2002. Between May 30, 2002, and November 27, 2002, the Union and Titan corresponded regarding the implementation of the Arbitration Award.

On May 30, 2002, John Peno, President of USWA, sent a letter to Joyce Kain "demanding" access to

- The identity of all bargaining unit employees who had retired since October 15, 1994, and all information used to calculate their pension.

- The identities of all bargaining unit employees with ten or more years of service who terminated employment with Titan since October 15, 1994, and the reason for their termination.

- A list of all bargaining unit employees whose pensions would be recalculated and all documents that would show the corrected calculations.

- A list of all bargaining unit employees who remained on the PPO from March 1, 1997, through the expiration of the 1995–96 labor agreement.

On July 22, 2002, counsel for USWA, Charles Armstrong, sent a letter to Gene La Suer, Titan's counsel, confirming a phone conversation about Titan's failure to respond to the Union's requests. On July 24, 2002, John Peno sent a letter to Joyce Kain giving Titan ten days to respond to the May 30, 2002, request.

On July 31, 2002, Gene La Suer sent a letter to John Peno apologizing for the delay and stating that Titan was concerned about releasing the requested information because it was confidential, and releasing it may expose Titan to lawsuits. Second, the information was irrelevant to the determination of the arbitrator's proposed remedy. Under the law, Titan did not believe the erroneous pension calculations could be re-figured. Furthermore, they asserted any recalculations would be to the employees' detriment.

La Suer further stated that the information was irrelevant to remedy the case because those who were terminated had no benefit due under the plan unless they qualified for a retirement pension because Titan had no requests for a disability pension during that time. Furthermore, there would be no re-calculations of pension unless Titan would be permitted to reduce the pensions for those pensioners who had been overpaid. Titan believes that historically pensions had either been calculated at the rate mandated by the Award or under a rate that was more favorable to the employee.

La Suer's letter went on to state that Titan provided a copy of the Arbitrator's Award to its actuary to make sure the plan documents were in line with the Award. As for the medical information requested, Titan had requested a list of those persons from Principal, the PPO provider, asking for the names of individuals who were covered by the PPO in the disputed year. Titan had not received any information from Principal, nor did Titan have any information regarding usage of the PPO, and Titan believes that only a handful of employees used the PPO during the final year of the CBA. Principal claimed it did not have information dated back that far,

so it was unclear what information Titan would receive or when it would be received.

On November 4, 2002, Daniel Kovalik, Assistant General Counsel to USWA, sent a letter to La Suer stating Titan had simply chosen to ignore the Arbitration Award. Kovalik reminded La Suer that the statute of limitations to contest the Arbitration Award had expired. Therefore, if he did not hear from Titan within seven days, he would file a federal action to enforce the award.

On November 5, 2002, La Suer sent a letter to Kovalik indicating that neither he nor Titan had ignored the Arbitration Award and stating that he had sent a copy of the Arbitration Award to the actuary but had not heard that there were any changes necessary. La Suer acknowledged that the plan did call for a disability pension but that Joyce Kain told him no employees had sought a disability pension since the date of the Arbitration Award. La Suer recited the contents of the July 31, 2002, letter and stated that Titan was willing to discuss any concerns the Union had regarding the Award.

On November 15, 2002, Kovalik sent a letter to La Suer recounting the information requested in the May 30 and July 24 letters. Kovalik also stated that the Union was "aware that the Company has information in a book in Des Moines indicating what benefits, such as PPO benefits employees were receiving during the period March 1, 1997 through May 1, 1998." In addition, Kovalik indicated that two employees applied for disability pension and that there were possibly others who retired prior to the Arbitration Award and should be eligible for a disability pension. Kovalik suggested that Titan should have information on such employees and requested that Titan provide that information to the Union. Kovalik asserted that

failure to do so constituted a violation of the National Labor Relations Act as well as a failure to comply with the Arbitration Award. Kovalik gave Titan fourteen days to provide the requested information or it would file a lawsuit.

On November 27, 2002, La Suer sent a letter to Kovalik stating the July 31, 2002, letter *was* a response to the Union's request. La Suer stated that Titan believed no one had their pension calculated at a "reduced" rate, and if anything, the only dates used by Titan were October 15, 1994, or after; therefore, any miscalculation would be in the employee's favor. La Suer stated that only two of those named in Kovalik's November 15, 2002, letter filed for disability pensions; Titan never received disability pension applications from the others named in the letter. Finally, La Suer denied having the "book" that allegedly contained information about member benefits.

On January 30, 2003, Plaintiffs filed this Complaint pursuant to the Labor Management Relations Act, 1947 ("LMRA"), 29 U.S.C. § 185 and the Federal Arbitration Act, 9 U.S.C. § 9, arguing Titan had failed and refused to comply with the terms of the Arbitration Award. The Union asks the Court to order Titan to comply with the Arbitration Award and requests attorney fees and costs.

In this Motion for Summary Judgment, the Union asks the Court to enforce the Arbitrator's Award by requiring Titan to recalculate the pension for all collective bargaining unit employees who applied for and received an early retirement pension subsequent to October 15, 1994, and were credited for age accrual through their actual date of retirement rather than the October 15, 1994, date. The Union asks that those individuals receive compensation for the difference between what they did receive and what they should have

received plus interest and that Titan continue to pay that monthly benefit amount. The Union next asks that Titan accept and process disability pension applications for twelve individually named employees. The Union asks that for those that qualify for Social Security Disability, Titan pay them retroactively to the date of disability plus interest and continue paying ongoing monthly disability pension benefits. The Union's final request is that Titan refund any participant in the PPO plan the excess 10% co-payment they were required to pay during the period March 1, 1997, through April 20, 1998, plus interest.

Titan resists the motion, arguing the Union is attempting to resolve issues not presented to the Arbitrator.

## STANDARD FOR SUMMARY JUDGMENT

Federal Rule of Civil Procedure 56(c) states that "the judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Fed. R.Civ.P. 56(c)).

■ "To preclude the entry of summary judgment, the nonmovant must make a sufficient showing on every essential element of its case on which it has the burden of proof at trial." *Cont'l Grain Co. v. Frank Seitzinger Storage*, 837 F.2d 836, 838 (8th Cir.1988). Rule 56(e) requires "the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 56(e)).

The Court's function on a motion for summary judgment is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Niagara of Wis. Paper Corp. v. Paper Indus. Union–Mgmt. Pension Fund*, 800 F.2d 742, 746 (8th Cir.1986). " 'On summary judgment the inferences to be drawn from the underlying facts ... must be viewed in the light most favorable to the party opposing the motion.' " *Matushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962)); *Econ. Housing Co. v. Cont'l Forest Prods., Inc.*, 757 F.2d 200, 203 (8th Cir.1985). "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 257, 106 S.Ct. 2505. On the other hand, "[w]hen a motion for summary judgment is made and properly supported, the nonmoving party may not rely on bare allegations but must set forth specific facts showing that there is a genuine issue for trial." *LeBus v. Northwestern Mut. Life Ins. Co.*, 55 F.3d 1374, 1376 (8th Cir.1995).

Summary judgment is clearly an appropriate mode for the resolution of an action to enforce an arbitrator's award. The ordinary analysis of motions under Fed.R.Civ.P. 56 is not particularly helpful, because the enforcement proceeding is by nature summary. *Disputes of fact should have been resolved by the arbitrator, and may not be addressed by the district court,* even if the court is convinced that the arbitrator committed serious error.

*Air Line Pilots Ass'n Int'l v. Aviation Assocs. Inc.,* 955 F.2d 90, 93 (1st Cir.1992) (emphasis added) (citing *United Paperworkers Int'l v. Misco, Inc.,* 484 U.S. 29, 38, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987)).

## DISCUSSION

The Union argues Titan is required to credit those employees who elected the early retirement option under Section 6.05(a)(2) of the Pension Plan with advances in age beyond October 15, 1994, if they were between the ages of 55 and 62 and had less than 30 years of credited services as of October 15, 1994. The Union argues that Titan knows the identity of those retirees and has access to its own worksheets which contain information about "who" was damaged by the Pension Plan miscalculation. The Union states that it has submitted worksheets for five retirees, and those worksheets confirm that upon retirement, Titan arbitrarily selected an age and date of termination prior to their actual age and termination of employment. The Union argues that the correct benefit can readily be calculated from Titan's own worksheets.

The Union next argues that Titan has refused to calculate and pay disability pensions as required under the Arbitration Award. The Union maintains that it sought arbitration in part to resolve the dispute that there was a disability plan available as of October 15, 1994. It is the Union's position that Titan refused to accept applications for disability pensions.

Finally, the Union argues Titan admits it has not refunded any excess co-payments, and its only excuse is that Principal is unable to provide information about who used the plans. The Union's rebuttal to this defense is that "one would assume that Principal Insurance provided Titan with monthly invoices which showed this claims data when it sought reimbursement from Titan as a self-insurer." The Union believes Titan is simply unwilling to undertake the effort to locate this information within its own files.

Titan argues the Union seeks to expand the Arbitration Award through this lawsuit and require Titan to make payments under the Pension Plan that are not required by the plan itself. Titan reiterates that it does not challenge the Arbitration Award itself; rather, it challenges some of the claims made by the Union in connection with this lawsuit. Titan asserts that in an action to enforce an Arbitration Award, the Court is confined to ascertain whether the party seeking enforcement is making a claim which on its face is governed by the contract. *Steelworkers v. Am. Mfg. Co.,* 363 U.S. 564, 567–568, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960).

With respect to the Pension Plan, the Union is asking to have the pensions of certain individuals recalculated. Titan claims that before September of 1996, all pensions including the pensions of the named individuals were calculated by Pirelli. Titan argues that the Union has not attempted to contact Titan or Pirelli for a recalculation of those benefits. Titan also argues that the Union cannot single out individuals for recalculation, but that the benefits of all retirees during the relevant period should be recalculated, and that the pensions of those who benefitted from the miscalculation should be reduced. The

Union responds that Titan, or the Court if necessary, can easily recalculate the benefits of those individuals using Titan's worksheets and that Titan's argument about possible overpayments is irrelevant to this motion.

The Arbitration Award orders Titan "to calculate and pay pensions in accord with this interpretation for pension claims arising during the term of the 1995–98 labor agreement." The Court does not read the Award as precluding Titan's interpretation.

Regarding disability pensions, Titan argues it is complying with the Arbitration Award and has considered the applications of the individuals that applied for disability pension during the relevant period. Titan found either those individuals did not qualify for disability benefits or their applications were rejected because they did not file for disability benefits until after they started receiving pension benefits. The Union asks that Titan also consider applications of individuals that erroneously applied for retirement benefits in lieu of disability benefits. However, the Arbitrator did not discuss this issue, and therefore this issue is also in dispute.

Finally, regarding the overpaid PPO co-payments, as Titan asserts, the information sought was more than five years old; on the record before this Court, neither Titan nor Principal has a list of those persons that had the PPO coverage, making it impossible to determine who or how much was overpaid. Nor has the Union provided information on amounts paid by individuals or presented any idea of how that the information might be obtained.[4] There is no basis upon which the Court can conclude as a matter of law that Titan is refusing to honor the Arbitration Award,

nor is there any cognizable remedy for the Court to enforce.

■■■ While this Court has jurisdiction to enforce an arbitration award, see Int'l Broth. of Elec. Workers, Local Union No. 545 v. Hope, 380 F.3d 1084, 1097 (8th Cir.2004) ("[S]ection 301 of the LMRA serves as an independent source of federal jurisdiction for district courts to enforce arbitration awards."), the Court is limited to enforcing the agreement and may not create one, see Union Pac. R. Co. v. United Transp. Union, 3 F.3d 255, 260 (8th Cir.1993) ("Consequently, the arbitrator's award, 'just as a contract, is the expression of the parties' will.' That rationale underlies the courts' limited review of arbitration awards; courts may only enforce the parties' agreement, they may not create an agreement.") (citations omitted) (quoting Stead Motors of Walnut Creek v. Auto. Machinists Lodge No. 1173, 886 F.2d 1200, 1206 (9th Cir.1989)). Because the parties disagree on the relief due under the Arbitration Award, the request to "enforce" the agreement becomes a request to fashion a remedy. This Court is not authorized to undertake such a task.

The facts demonstrate that the only issue on which the parties agree is that the Arbitration Award must be enforced. There are several factual issues in dispute regarding the Arbitration Award; the Union is clearly asking the Court to resolve a factual dispute, which the Court cannot do. Air Line Pilots Ass'n Int'l, 955 F.2d at 93 (citing Misco, Inc., 484 U.S. at 38, 108 S.Ct. 364) ("Disputes of fact should have been resolved by the arbitrator ....").

## CONCLUSION

For the foregoing reasons, the Court finds the requested relief is beyond the

---

4. The Court notes the reference in Daniel Kovalik's letter dated November 15, 2002, to a "book" Titan had in Des Moines with information regarding which employees had the PPO plan, but Titan denies possessing such a book. Thus, the Court is presented with a bare allegation and bare denial, creating an inescapable question of material fact.

scope of this Court's jurisdiction and involves numerous issues of material fact. Therefore, Plaintiffs' Motion for Summary Judgment (Clerk's No. 10) must be **denied.**

In denying the motion, the Court is cognizant of the April 15, 2005, trial date and questions whether further proceedings in this Court will effectively resolve the disputes in this case. The ultimate resolution of the dispute may require extension or modification of the arbitration award. Accordingly, the Court has considered whether the case could or should be remanded to the Arbitrator with specific directions to resolve these disputed issues and to fashion an enforceable remedy, *see Int'l Broth. of Elec. Workers, Local No. 265 v. O.K. Elec.,* 793 F.2d 214, 216 (8th Cir.1986) ("Because the [arbitration] Council did not fashion a remedy, the district court correctly determined that there was nothing for the court to enforce, and it properly remanded the matter to the Council to determine the appropriate remedy."); however, the Court is disinclined to take such a step without providing the parties with the opportunity to more specifically address the issue.[5] Therefore, the parties are ordered to submit supplemental briefing on the issue of a remand to the Arbitrator by March 11, 2005. The parties will then have until March 18, 2005, to respond to the opposing side's argument. This schedule is set with due regard for the current trial date and the age of this dispute. The parties may advise the Court if more time is needed, but an extension will necessarily move the trial date.

**IT IS SO ORDERED.**

---

**5.** During oral argument on the current motion, the Court did generate some discussion on this point, but that discussion was not adequate to provide the parties a full opportunity to argue their positions.